

Cream City Reporting LLC

---

In the matter of:

**In re: Christopher E. Knight
(Debtor)**
Case No.: 24-22327-RMB (Chapter 7)
**Markos Ramirez**
vs.
**Christopher E. Knight**

Case No.:  24-02105-RMB

Witness:  Markos Ramirez

Date:  March 12, 2025

Court Reporter:  Sheryl Stawski, RPR

---

790 North Milwaukee Street, Suite 100-C
Milwaukee, WI 53202
414.585.8128
www.creamcityreporting.com

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WISCONSIN

―――――――――――――――――――――――――――――――――――――――

In re:  CHRISTOPHER E. KNIGHT,

                    Debtor

                              CASE NO.: 24-22327-RMB
                              (Chapter 7)

―――――――――――――――――――――――――――――――――――――――

MARKOS RAMIREZ,

                    Plaintiff,
                              ADVERSARY
          -vs-                CASE NO.:  24-02105-RMB

CHRISTOPHER E. KNIGHT,

                    Defendant.

―――――――――――――――――――――――――――――――――――――――


          Examination of MARKOS JESUS RAMIREZ,
taken at the instance of the Defendant, under and
pursuant to the Federal Rules of Civil Procedure,
pursuant to Notice of Deposition, before SHERYL L.
STAWSKI, a Registered Professional Reporter and
Notary Public, in and for the State of Wisconsin,
via Zoom videoconference on the 12th day of March,
2025, commencing at 1:00 p.m. and concluding at 2:15
p.m.

A P P E A R A N C E S

MALLERY S.C., by
MR. ANDREW H. ROBINSON
731 North Jackson Street, Suite 900
Milwaukee, Wisconsin, 53202
Appeared on behalf of the Plaintiff.

KERKMAN & DUNN, by
MR. EVAN P. SCHMIT
839 North Jefferson Street, Suite 400
Milwaukee, Wisconsin, 53202
Appeared on behalf of the Defendant.

EXAMINATION BY:                                          PAGE

MR. SCHMIT                                                  3

I N D E X

|  | MARKED | ID |
|---|---|---|
| EXHIBITS: | | |
| Exhibit 1 - Complaint | 22 | 22 |
| Exhibit 2 - Mortgage | 30 | 30 |
| Exhibit 3 - Plaintiff's Responses to Interrogatories | 37 | 37 |
| Exhibit 4 - Verification of Responses | 37 | 37 |
| Exhibit 5 - Emails | 54 | 54 |
| Exhibit 6 - Text Messages | 59 | 59 |
| Exhibit 7 - Proof of Claim | 63 | 63 |

REQUESTS BY:                                             PAGE

Mr. Schmit - Emails re Mortgage and Note
          with Attorney                                    22

1              TRANSCRIPT OF PROCEEDINGS

2                  MARKOS JESUS RAMIREZ, called as a

3   witness herein, having been first duly sworn on

4   oath, was examined and testified as follows:

5                      EXAMINATION

6   BY MR. SCHMIT:

7   Q   Mr. Ramirez, if you could please state your full

8       name for the record.

9   A   Markos Jesus Ramirez.

10  Q   All right.  And, Mr. Ramirez, have you ever been

11      deposed before?

12  A   No.

13  Q   All right.  Well, it's important that as you go

14      through this process we don't talk over each

15      other.  All right?

16  A   (Witness nods head.)

17  Q   And you're nodding your head yes, which leads me

18      to another thing.  Whenever I ask you a

19      question, I'm going to need you to make a verbal

20      response.

21  A   Understood.

22  Q   Thank you.  It's especially important here on

23      Zoom that we're not talking over each other

24      since it's hard to -- for her to capture

25      everything.  These are the ground rules.

1          I'm going to be asking you questions.

2      If you answer a question, I'm going to assume

3      you understood it; is that fair?

4   A  That's fair.

5   Q  Another way of saying it, if you don't

6      understand a question, feel free to tell me that

7      you do not understand it.  All right?

8   A  Understood.

9   Q  Okay.  Also, there's going to be an opportunity

10     after I ask a question for your counsel,

11     Attorney Robinson, to interject with an

12     objection; that's so he can make his record and

13     preserve any objections he might have for a

14     later hearing before the court, so give him time

15     to do that.

16          Unless you're instructed not to

17     answer the question, I would ask that you answer

18     the question.  Okay?

19  A  Understood.

20  Q  All right.  Why don't we start with a little

21     background.  I understand you live in Arizona,

22     correct?

23  A  That is correct.

24  Q  All right.  Can you provide me with your

25     address?

1    A    23121 North 98th -- that's 9-8 -- Drive in

2         Peoria, Arizona, 85383.

3    Q    All right.  How long have you lived in Arizona?

4    A    Since 2020.  We came out here in July of 2020.

5    Q    Before that?

6    A    In this residence -- since October is when we

7         moved in.

8    Q    Before moving to Arizona, where did you live?

9    A    I lived in Elm Grove, Wisconsin.

10   Q    How long had you resided in Elm Grove,

11        Wisconsin?

12   A    I believe we purchased the property in 2016 and

13        rehabbed it and moved in in what would have been

14        the spring of 2017.

15   Q    So can you explain that for me?  You said you

16        purchased a property in Elm Grove in 2016,

17        rehabbed it; and then you -- I assume you mean

18        you and your family occupied it sometime in

19        2017, correct?

20   A    That's correct.

21   Q    All right.  Then you lived there for a period of

22        20 years -- excuse me, three years -- until

23        2020?

24   A    Three years.  2020, yes, sir.

25   Q    See, there will be times like this where it

1       wouldn't make sense.

2                   Can you tell me, sir, what's your

3       educational background?

4   A   I have an undergraduate degree from Marquette

5       University in secondary education and theology

6       with political science and history minors.

7                   I have a master's in education from

8       the University of Massachusetts at Amherst.  I

9       was a school teacher for years and then

10      transitioned into construction work.

11                  Since 2010 I was self-employed doing

12      construction work, and for about six years

13      worked at the City of Milwaukee as an inspector

14      and a fire inspector.

15  Q   Okay.  We'll go through some of that a little

16      bit.  You kind of jumped ahead of my outline

17      here just on education.  That's okay.

18                  So you said you went to Marquette.

19      Are you from Wisconsin, or are you a native --

20  A   I'm originally from Miami.  I like to say that I

21      cry for the Dolphins, and I root for the Pack.

22                  I lived 30 years in Wisconsin.  So

23      ten years in Florida, 30 years in Wisconsin; and

24      then, yeah, went to Marquette University High

25      School on a scholarship and work grant and went

1      to Marquette University as well on a

2      scholarship.

3  Q   Well, I went to Marquette for law school.  We

4      had a few guys there who did Marquette High

5      School, Marquette undergrad and then Marquette

6      Law School.  I can't remember what they were

7      called.  They had some little club.

8  A   (Laughter).

9  Q   So you said you've been self-employed since 2010

10     doing construction.  Can you explain to me what

11     you do in construction?

12 A   Yeah, I was a licensed -- well, I started as a

13     laborer when I was about 15 years old and then

14     kind of worked my way through the ranks doing --

15     up to management with construction companies;

16     and then in 2010 I started my own company as

17     well as working with some partners -- my best

18     friend.  We did remodeling.  So kitchens,

19     bathrooms, roofs, windows, doors, top to bottom

20     residential remodeling.

21             Then I transitioned after a couple of

22     years to purchasing and rehabbing properties; so

23     rental properties in the city of Milwaukee.  We

24     purchased them.  I would rehab them.  I would

25     manage them myself, manage repairs, things of

1    that nature; and that was what I did.  So it was

2    a combination of contract work and then my own

3    real estate dealings.

4             And then in approximately 2014, I

5    believe, I transitioned -- to be honest, I got

6    tired of working with customers; and I focused

7    on my own work; so that's when I started doing

8    flips and holding rental properties.

9  Q    Okay.  And you started the company -- your own

10     company, what was the name of the company?

11  A    M&M Property Management.

12  Q    And you said you started it with your best

13     friend.  Who?

14  A    No, that was independent.  So I have two folds.

15     I had that one for holding my real estate and

16     doing those jobs.  And then with the partners,

17     with two other partners we had CNR Construction,

18     which was also a Wisconsin limited liability

19     company that was a general contractor that was

20     licensed in the state of Wisconsin.

21  Q    When you say "CNR" --

22  A    Well, my best friends, Joe Nicholas and Paul

23     Coulter.  The letter acronyms are our last

24     names:  Coulter, Nicholas, Ramirez.

25  Q    So it was around 2014 that you started, you

1        said, flipping properties; is that correct?

2    A   Yeah.

3    Q   And by flipping properties, you're saying you're

4        purchasing them and rehabbing them and sometimes

5        managing or selling or --

6    A   Selling.  For those it was kind of a dual thing.

7        The cheaper properties I was purchasing myself.

8        The more lucrative properties were being

9        purchased with the ultimate goal of listing them

10       for sale.

11               Some of them did get held for a

12       certain period of time, you know.  I would wait

13       for the market to, you know, come back up if it

14       needed to; but the ultimate goal on those flips

15       was to purchase, rehab and sell.

16   Q   I can't remember 2014.  I started practicing in

17       2009 right after the housing crisis, so things

18       were crazy.  Trying to remember things in 2014.

19       Was it still good rates back then?

20   A   Yeah, it was pretty normalized; and at that

21       point I've always worked with my own capital --

22   Q   Okay.

23   A   -- and my own personal line of credit.  I have

24       not taken commercial loans.  I did take one

25       building loan in Florida because I started

1    building spec houses in Florida in 2018; but,

2    otherwise, I work with my own funds.

3  Q  2014, when you started with those properties,

4    through 2021, how many properties in total,

5    ballpark number -- doesn't need to be exact --

6    had you purchased yourself, financed and either

7    rehabbed or -- and held or rehabbed and flipped?

8  A  Properties that I held was 11 units.  I think it

9    was seven buildings.  And properties that were

10   just strictly flips, I think around seven.

11           You know, that's something I could

12   look up.  I was looking at my past tax records;

13   but off the top of my head, I think about seven.

14 Q  And, I'm sorry, the properties that you

15   personally were purchasing and flipping or

16   holding, that was through the -- what was the

17   name of the company?  D&M?

18 A  M&M, like the candy.

19 Q  I'm surprised that name wasn't already

20   registered.

21 A  There was some variations of that name.  Mine,

22   in particular, there was -- M&M Property

23   Management was available.

24 Q  Okay.  And now that you're in Arizona, what are

25   you doing?

1   A    Currently, I work as a safety manager working at

2       data center construction sites for Microsoft. I

3       actually just got my CHST certification this

4       weekend; so I've kind of been working my way

5       into that field since getting to Arizona, which

6       I really -- works with my background as an

7       educator and as inspector to try to keep people

8       safe.

9   Q    And you live there with your family, correct?

10   A    Yep, with my wife and two kids.

11   Q    And what's your wife's name?

12   A    Margaret Mary Veronica Campbell Ramirez.

13   Q    Does she go by Margaret or Maggie --

14   A    She goes by Meg. She gets upset if we call her

15       Maggie.

16   Q    My Aunt Margaret, she goes by Maggie; and what

17       would be a second cousin, she goes by Meg, so,

18       anyways, some background.

19             We're here on this adversary

20       proceeding that you filed in Mr. Knight's

21       individual bankruptcy case.

22             Can you tell me, how did you first

23       meet Chris Knight?

24   A    Yeah, I met Chris Knight at one of my flip

25       homes, which was in Cudahy, Wisconsin. The

gentleman who I purchased that home from and was
my listing agent advised me to use Chris as my
stager.

           And so I met Chris by having him
stage that property for sale, and then I ended
up using him to stage another property that I
had in Milwaukee on 70th Street.

           And that was where our relationship
kind of shifted a little bit.  I was having
difficulties with a contractor, and Chris
volunteered himself to help wrap up that
project; and that kind of started our
relationship.

           Ultimately, I ended up having Chris
become my property manager for properties that
we were -- that I was purchasing and then ones
that we were purchasing together; and that kind
of developed over a -- you know, I'd say two
year -- year-and-a-half, two-year period.

Q    Okay.  So, approximately then, when did you
     first meet Chris as the stager in Cudahy?

A    That's a really good question.  I think 20 --
     sometime between 2018 and 2019.  I don't
     remember exactly the date.

Q    Okay.  That's fine.  And you said that developed

1    over the years or over time, excuse me.  So it

2    developed over time from staging to maybe

3    helping with some of the construction,

4    improvements to actually purchasing properties

5    together, correct?

6  A  Correct.  He was managing properties that I was

7    purchasing individually, independently; and then

8    he was also bringing to me, to be more clear,

9    investment opportunities that he wanted me to

10   be -- basically I would put down the 10 percent

11   for receiving the hard money loan from Ben, and

12   then he would manage it.  He would manage the

13   construction, manage the tenant placement, and

14   then give me a return on that investment was the

15   plan.

16  Q  Okay.  And, approximately, how many properties

17   did you and Mr. Knight go into business together

18   on?

19  A  Four.

20  Q  Four?

21  A  Four, yeah.

22  Q  And was that all individually, or were you doing

23   it through businesses?  For example, Mr. Knight

24   has the East Town Management.

25  A  Yeah, I believe he was using East Town

1    Management; and I would have been using M&M

2    Property Management or my personal name.  I

3    don't remember the -- those are contracts that

4    Andrew has and that I could pull up.  I'm pretty

5    sure it was East Town Management and M&M

6    Property Management, if I recall correctly.

7  Q  Were you using Mallery as counsel for those

8    deals?

9  A  No, I was using -- for those deals, I didn't use

10   counsel.  I just -- I trusted Chris.  He and I

11   had contracts that were very simple.  You know,

12   I would put up 10 percent to start the deal; and

13   then in a couple of them I believe I received a

14   20-percent return, and then the last two a

15   30-percent return.

16          So that was just he and I making

17   agreements that we signed.  The Lone Tree

18   property I worked with a different attorney to

19   do that contract.

20          And then that attorney had advised me

21   when I reached out to him later on when things

22   weren't going well, he had advised me of the

23   Mallery Law Firm for my actual case.

24  Q  Okay.  Let's talk about the Lone Tree property.

25   And I think we all understand what I mean by the

1    Lone Tree property.  It's located in Elm Grove.

2    It's the subject of this proceeding.

3            So if we're all comfortable

4    proceeding with that, I'll call it the Lone Tree

5    property.  All right?  Good?

6  A  Yeah, understood.

7  Q  Okay.  Can you explain to me how that

8    opportunity was presented to you?

9  A  Yeah, I was actually standing right there behind

10   at the stand-up desk of mine.  Chris had given

11   me a call, and he said that he had an

12   opportunity in Elm Grove.

13           He and I were both of the mindset of

14   liking Elm Grove as a good area.  We both

15   purchased homes that we lived in for a few years

16   and then sold.

17           So we knew that market well.  He

18   presented it as an opportunity for me, again, to

19   put down that -- 10 percent down; and that he

20   would then get a hard money loan from Ben, and

21   that he would purchase the home, rehab the home

22   and list it for sale.  That's the way that it

23   was presented to me.

24           So, ultimately, I would put up

25   $75,000; and then at the end of the project when

1    it closed and it was sold, I would receive back

2    my 75,000 plus 75,000; so a total of $150,000,

3    which was a really -- a good deal.

4              The reason it makes sense, though, is

5    that Chris doesn't put any money up, right; so

6    that's why he explained to me why he would give

7    me that nice return as that it's limited

8    liability on his.  He just had to perform.  That

9    made sense to me.  I had known him for a few

10   years, and I liked the idea of that -- that

11   deal.

12   Q   Okay.  Just so I'm clear here -- you went a

13       little fast for me.  You provided $75,000 for

14       the purchase of the Lone Tree property, correct?

15   A   Yep.

16   Q   And then there's a hard money lender.  I can't

17       remember the initials, if it's H&L or HRL or --

18       but Ben's business provided the balance of the

19       purchase price, correct?

20   A   That's correct and the budget for repair.

21   Q   And Ben actually -- when you say "the budget for

22       repair," you mean he's financing them, correct?

23   A   Yeah.  My understanding of the loan is that I

24       was putting up the earnest money for the

25       purchase; and then I made payments for a certain

```
 1        amount of months -- I think it was six months --
 2        directly to Ben, and that Ben was providing a
 3        loan that would have enough money for the
 4        purchase, and I believe it was about $100,000
 5        for rehab of the home.
 6    Q   Okay.  So none of the money that you were
 7        financing was actually provided to East Town
 8        Management directly.  You were paying it --
 9        earnest money for the purchase --
10    A   Correct.
11    Q   -- and the loan is directly to Ben's company,
12        correct?
13    A   That's correct.
14    Q   And just to be clear, the only amount obtained
15        under the Lone Tree note was the $75,000,
16        correct?
17    A   That's correct.
18    Q   When this opportunity is presented to you, was
19        it a phone call first?  Was there an email?  How
20        did it play out?
21    A   It was a phone call just to kind of see if I had
22        interest.  And when I confirmed that I did have
23        interest and I wanted to see the numbers, he
24        sent me a very brief, simple email.  I believe
25        that that was on February 5th of 2021.
```

1            I made a couple notes last night just
2      to prepare for this.  They were pretty basic.
3      And that was one of the dates that stood out to
4      me, but that's when this was presented to me
5      verbally.
6            And then when he got off the phone,
7      he sent me a brief email that showed the list
8      price, the rehab price, the all-in costs, you
9      know, my money in and then potentially what it
10     was worth.
11           The resale, I believe, was 850 to
12     $900,000 was what he and I had gauged having a
13     pretty good understanding of that market in that
14     neighborhood.
15  Q   Okay.
16  A   So I felt that that was pretty safe.  I thought
17     there was a lot of room there.  All he had to do
18     was perform.
19  Q   So you're familiar with Elm Grove.  Did you have
20     an opportunity to sort of investigate the Lone
21     Tree property yourself?
22  A   I didn't walk through it.  A lot of the
23     investigation I do for real estate after a
24     number of years of experience I do online.
25           It's very much looking at, you know,

what the property is worth; looking at comps
that are in the neighborhood; understanding the
square foot price for sale.

I had done extensive research on that
because I did that for my personal home in Elm
Grove. I purchased a home that was owned by the
original owner's son and was very delapidated
and gutted to the studs, removed the roof
structure and put a significant amount of
capital into it and had a nice return when we
moved out here; so I had put effort into
understanding it.

My friends and I kind of worked -- we
really thought Elm Grove and Whitefish Bay were
the two, like, gold markets in Southeastern
Wisconsin; and so we paid a lot of attention to
it, viewed a lot of homes.

Q   What about Shorewood?

A   Yeah, Shorewood is nice. My best friend lives
in Shorewood. I've had a lot of sodas and
cookies in Shorewood, but Whitefish Bay -- for
some reason Whitefish Bay, man, it bangs. A lot
of people love that area.

Q   Let me follow up. Relative to Lone Tree, what
was the condition of the property in early

1    February when you were presenting with this

2    opportunity from Chris?

3  A  You know, like I said, I didn't do an extensive

4    investigation.  I was at a distance, so I just

5    looked at some photos.  I really trusted Chris,

6    and it just sounded like it needed upkeep, you

7    know, the yard, the pool, outside, inside.

8           Do some remodeling, you know,

9    kitchen, bathroom spruce-up, which, you know --

10   like I said, Chris and I have both done for our

11   own homes.  I know he owned a home a few blocks

12   away from me in that area, too, which he did a

13   really nice job.  Actually, it was a house that

14   I wanted when it was for sale.

15           So I felt -- it seemed cosmetic.

16   There did turn out to be some foundation issues;

17   but, again, that was addressed or at least

18   supposedly addressed.  I did not inspect that

19   upon completion, but it seemed like cosmetic,

20   you know, get it fixed up until that discovery

21   was made in the basement; but even that wasn't

22   any sort of major concern.

23  Q  Do you remember any of the circumstances as to

24   why the property was being sold or how it was

25   being sold?

1  A   I don't recall if it was a foreclosure or a

2      short sale or something like that, or estate.

3      It might have been an estate.

4              I do remember that it seemed like

5      Chris really needed for me to make a decision

6      quickly, which I was comfortable with because I

7      understand that market; so it might have -- if

8      I -- I think it might have been an estate that

9      he dealt with to manage that sale price and get

10     that deal closed.

11 Q   Speaking of closing, you're talking in early

12     February, correct?

13 A   Of 2021, yeah.

14 Q   2021.  Do you recall when the sale was able to

15     close?

16 A   To purchase the property?

17 Q   Correct.

18 A   Relatively close after that because I just

19     remember -- if we reference that email -- I can

20     pull it up if you want -- Chris mentioned that

21     that earnest money needed to be in, like, that

22     following week; so it was relatively quick.  I

23     would guess the next 30 days to 60 days that

24     deal was closed, I think.

25 Q   Okay.  Well, let's see if I can ask you to -- do

1    you recall when you executed the mortgage and

2    the note for the mortgage, was that at closing?

3  A   I don't recall to be honest.  I don't recall.

4  Q   Okay.

5  A   I can probably pull some emails that I had with

6    that attorney and try to, like, you know, line

7    it up.  Off the top of my head, I don't recall

8    how that lined up.

9  Q   Well, here's what I'd ask in that regard.  If

10    you have any emails related to that, I would ask

11    that you provide them to Attorney Robinson so

12    that he can supplement the document production

13    in the case.  Okay?

14  A   Yeah, he should have all that.

15            MR. SCHMIT:  Okay.  So let's take a

16    look then at a document I'm sure you're familiar

17    with.  It's what I'll Exhibit 1.  And I can

18    provide these to you, Sheryl, afterwards.

19            (Exhibit No. 1 was marked.)

20  BY MR. SCHMIT:

21  Q   Are you able to see what is on my screen?

22  A   Yes.

23  Q   Now, I'll scroll down.  It's ten pages.  Are you

24    familiar with this document?  Go to the bottom,

25    and you'll see Attorney Robinson's signature.

1   A    Yes.

2   Q    I'll represent this is a complaint that was

3        filed in this case.

4   A    Okay.

5   Q    There's a couple allegations -- well, several

6        that I want to review with you just so I

7        understand.

8                  At one point there's an allegation

9        that the debtor represented to Ramirez that the

10       loan would be used to fund a down payment on a

11       residential property, the Lone Tree property.

12                 Do you dispute whether the loan

13       proceeds were used for the down payment on Lone

14       Tree?

15  A    No.

16  Q    Okay.  Do you agree that to the extent it was

17       represented that the down payment or the

18       proceeds would be used for a down payment, they

19       were, in fact, used for that?

20  A    Correct.

21  Q    There's another line here.  It states that

22       debtor also represented to Ramirez that he --

23       that he and East Town would not occupy the flip

24       property.

25                 Can you explain to me, when did Mr.

1     Knight represent that neither he nor East Town

2     would occupy the flip -- the Lone Tree property?

3  A  Yeah, at the initial conversation that we had

4     the plan was to list it for sale, and that's how

5     I would get repaid.

6  Q  And so you're saying he expressly said to you on

7     the phone, we'll list it for sale; I'm not going

8     to occupy this property at any point?

9  A  The conversation that he and I had was not in

10    relation to anyone moving in because that was

11    never part of the deal.  The conversation that

12    we had was about it being listed for sale and

13    the marketability of it.

14 Q  Well, you referenced earlier that he followed up

15    with an e-mail -- Mr. Knight did -- after your

16    phone call, correct?

17 A  Correct.

18 Q  That email outlines the deal points, correct?

19 A  Correct.

20 Q  If I scroll down on the complaint here -- I just

21    want to make sure.  There's an insert here in

22    the box that you purchased Elm Grove

23    February 5th, 2021.  Is that the email that

24    you're referencing?

25 A  Yes.

Cream City Reporting, LLC
414.585.8128

1  Q   Can you tell me, is there anywhere in this email

2      communication where Mr. Knight represents that

3      he will not occupy the Lone Tree property?

4  A   Like I said, that wasn't part of the

5      conversation.

6  Q   Right.

7  A   What he represented here, that I see, was that

8      he showed the value of the resale, which would

9      be 850 to 900,000.

10 Q   Well -- and maybe you can show me where because

11     I don't see anywhere where it says the resale

12     value.

13 A   Purchased -- I'll just read it off.  Line item,

14     the first one, purchase price 370, improvements

15     100, ARV 850 to 900K.

16 Q   Okay.  And what are you saying that the "ARV"

17     means?

18 A   That's the estimated value of the home to sell.

19 Q   Now, you said "estimated value" to sell.

20             We're talking about a split, and

21     earlier you were testifying about Mr. Knight

22     having purchased a property, improved it and

23     then occupied it, correct -- prior to Lone Tree?

24             MR. ROBINSON:  Objection;

25     mischaracterization of prior testimony.  Go

```
 1        ahead and answer, if you can, Markos.
 2                      THE WITNESS:  That was his personal
 3        home.  That's where I went and met him.  That's
 4        where we would meet and talk.
 5   BY MR. SCHMIT:
 6   Q    I'm sorry, Mr. Ramirez, did I mischaracterize
 7        your prior testimony, or is that accurate?
 8                      MR. ROBINSON:  Objection; form of the
 9        question.  Go ahead and answer, if you can,
10        Markos.
11                      THE WITNESS:  I can't.  I don't
12        understand the question.
13   BY MR. SCHMIT:
14   Q    Sure.  I want to know if I actually --
15        accurately described how you testified about
16        Mr. Knight previously purchasing a property,
17        repairing it and then occupying it, correct?
18   A    Correct.
19                      MR. ROBINSON:  Objection; it's the
20        form of the question, Evan.  It's whether that
21        constitutes a flip property or constitutes some
22        other form of investment in real estate.
23                      MR. SCHMIT:  Andy, I didn't ask
24        anything about a flip property.  What I asked
25        Mr. Ramirez about, was he familiar with and
```

1   understood that Mr. Knight had previously

2   purchased a property, improved it and then

3   occupied it, correct?

4              MR. ROBINSON:  I think the initial --

5   the initial question had a reference to whether

6   that was a flip.  I understand where you're

7   going.  That's why I'm saying, Markos, if you

8   can answer, go ahead and answer.

9              THE WITNESS:  Can you repeat the

10  question, please?

11             MR. SCHMIT:  Sure.  Let's just back

12  up.

13  BY MR. SCHMIT:

14  Q   When we started our testimony, I was asking you

15      about where you lived in Wisconsin.  You

16      mentioned that in 2016 you yourself had

17      purchased a property, repaired it and then lived

18      in it, correct?

19  A   Yep.  That was our personal home until we moved

20      to Arizona.

21  Q   In fact, you had talked about that as being a

22      house that you then sold presumably for more

23      than you purchased it, correct?

24  A   That's correct.

25  Q   And that you are also familiar with Mr. Knight

1      through, in part, him previously purchasing a

2      property in Elm Grove, repairing it and then

3      selling it, correct?

4  A   No.  Living in it.  That was his house.

5  Q   Oh, living in it and then later he sold it?

6  A   I didn't find out that until this all kind of

7      went south.

8  Q   Okay.  Is that the property he was occupying

9      prior to Lone Tree?

10  A  Yeah, that's my understanding.  I don't know his

11     personal stakes at that point; but the home that

12     I met him at, right, that we would meet, and I

13     would bring checks, and we would talk, was a

14     home that I wanted to buy as an investment.

15             So, you know, he and I just kind of

16     both thought that was quirky, and -- but that

17     was his personal home.  I remember him and his

18     wife fixing it up, made it a really nice home;

19     and that was where he lived.  He and I lived

20     just a couple blocks away from each other.

21  Q  Going back to your email -- or the email from

22     Chris on February 5th, 2021, just so I'm clear,

23     this email summarizing the deal points, does it

24     state anywhere that Mr. Knight is going to flip

25     the property by selling it?

1  A   That was a conversation that he and I had had

2      verbally, then the email followed up.  To me,

3      the email was to kind of put the numbers in

4      front of me based on the conversation he and I

5      had.

6              The conversation was this is an

7      investment property to sell.  You'll get your

8      money back when the property sells.  Initially

9      we thought about ideally listing it the

10     following spring.  That was -- that was the

11     conversation he and I had.

12 Q   Okay.  So when did you -- when did you first

13     learn that Mr. Knight and you had this

14     disagreement on what it means to flip a property

15     if he's intending to refinance and obtain the

16     property himself?

17 A   I mean, that's not a -- I wouldn't say it's a

18     disagreement.  The first time that Chris

19     presented that to me was when my family did a

20     road trip back to Wisconsin in the summer of

21     '22.

22              And he and I had walked the property

23     at that point just to kind of see where it was

24     at and what was left.  Clearly, it was way

25     behind schedule at that point.

1          And if I recall, when we met in

2    person, we didn't discuss it.  I believe he

3    called me maybe a couple weeks later in August

4    and asked me -- and pardon my French -- the

5    question he asked me was how do you feel about

6    me being the buyer for the property.

7          And my exact response was, I don't

8    fucking care who buys it, you know.  I didn't --

9    I didn't think that -- doesn't matter to me.  I

10   don't care who buys the house.  I do real estate

11   investments.  It's not personal.  I want it on

12   the market.  I want it sold.  If somebody else

13   wants to buy it off market, be my guest.

14   Q   So if it's a flip for a sale or a flip to a

15   refinance to Mr. Knight personally, you don't

16   really care, correct?

17   A   Yeah, as long as it closes and I get my money,

18   no.

19               (Exhibit No. 2 was marked.)

20   BY MR. SCHMIT:

21   Q   Okay.  Let's jump ahead a little bit.  I'm going

22   to show you what I have marked as Exhibit 2.

23   Can you identify what these documents are for

24   me?

25   A   I believe this is the agreement that I had the

1       attorney write up for us to do this deal.

2   Q   So page 1 it says, "Mortgage," and then it

3       continues for four pages -- or five pages, and

4       then you get to the mortgage note, correct?

5   A   Correct.

6   Q   And I'm going to point out that the mortgage

7       note is dated October 13th, 2021 as well as the

8       mortgage itself being signed October 13th, 2021.

9   A   Okay.

10  Q   Do you see that?

11  A   Yep.

12  Q   To the extent this was executed at closing, it

13      would appear that -- at any rate, the note and

14      the mortgage itself were in October --

15  A   Correct.

16  Q   -- about eight months after the first

17      discussion, correct?

18  A   Correct.

19  Q   All right.  I'm on page 4 of this document, and

20      it says, "This instrument drafted by" -- it

21      looks like Attorney Ajay --

22  A   Kuttemperoor.

23  Q   Okay.  Is that the attorney you had prepare

24      these documents?

25  A   That's correct.

```
1    Q    Was Attorney Kuttemperoor at Mallery at that
2         time?
3    A    No.  He was an independent attorney.  As far as
4         I knew, he was an attorney that was referred to
5         me by my best friend Daniel Liquin (phonetic).
6         He had done some deal with him, and he knows
7         more about, you know -- I don't want handshake
8         deals.  I've done -- a lot of work I do on my
9         own.
10                   And so I reached out to Dan because I
11        knew that this was something that I should have
12        a legal document for.  And so it was referenced.
13        I reached out, and I'm pretty sure that he had
14        his own practice at that point.
15                   He worked somewhere else.  When I
16        reached out to him when this was going south, he
17        advised me to reach out to Mallery.  I believe
18        he was still independent at that point.  Now he
19        works for someone, but I don't know who it is.
20                   MR. ROBINSON:  He's with our firm.
21        He started in January of 2024 here, Evan.
22                   THE WITNESS:  I didn't know that.
23   BY MR. SCHMIT:
24   Q    It all makes sense to me.  I was just trying to
25        figure out if he went from real estate to
```

1   litigation.

2                   Markos, are there any other documents

3   related to the one that you're familiar with?

4   A   No.

5   Q   Okay.  So there's no loan agreement related to

6   the note, correct?

7   A   Correct.

8   Q   So there wouldn't be a business purpose

9   affidavit attesting that this loan is solely for

10  business purposes, correct?

11  A   This is the only document that I'm aware of.

12  Q   Okay.  The mortgage and the mortgage note,

13  correct?

14  A   That's correct.

15  Q   I'm going to go back to Exhibit 1.  You had an

16  appraisal prepared of the Lone Tree property,

17  correct?

18  A   There was an appraisal of the Lone Tree property

19  that was done, I believe, last year just to

20  ascertain the status of the property.

21  Q   All right.  I'm going to scroll to paragraph 24

22  of your complaint.  It states that "On June 13,

23  2024, Ramirez obtained an appraisal of the Flip

24  Property from Whitehouse Appraisals."

25                  That is consistent with what you were

1       saying; there was an appraisal prepared in 2024,

2       right?

3    A  Correct.

4    Q  All right.  It noted that -- there's a comment

5       here about several issues with this Lone Tree

6       property.

7              Bullet point 2, it states, "The

8       basement appears to have been flooded from

9       improper sump pump drainage.  The drywall has

10      been damaged, and the finished area of the

11      basement needs to be rebuilt."

12             Do you see that line?

13   A  Yes.

14   Q  Do you recall learning of any flooding at the

15      Lone Tree property?

16   A  I knew that there had been some water in the

17      basement.  Like I referenced earlier, there was

18      some discovery of a basement issue.

19   Q  I'm wondering if there was a flooding event that

20      you recall occurring after the purchase of the

21      Lone Tree property.

22   A  I mean, it says it right there that there was

23      damage; but I do believe that I had spoken to

24      Chris about that.  He had to cut out some

25      drywall or something.

1  Q   Okay.  I guess my question for you then is:  Did
2      it occur after the closing, or was it damaged
3      that you're aware of prior to closing?
4  A   No, it would have been during the construction
5      phase.  I think I'm freezing up here.
6  Q   I can hear you, but -- you're not moving or
7      you're playing a very good game of sitting
8      still.
9  A   I am not that still.  The video is frozen, but I
10     can hear you.
11 Q   And, obviously, Chris doesn't control that the
12     basement would flood, does he?
13 A   I don't know how to answer that.  Basements
14     flood in Wisconsin.  It happens.  If you have
15     appropriate construction, and you have
16     appropriate drain tile and you have appropriate
17     sump pumps operating the way they should, they
18     can be mitigated, but it happens.
19 Q   If he's buying the property from an estate
20     sale -- let's make that assumption -- how was he
21     supposed to know ahead of time that the property
22     would flood in September of 2022?
23 A   I don't understand what the -- why that's even
24     pertinent.  I didn't say that.
25 Q   Well, I'm asking you if you'd agree that Chris

1    wouldn't be able to know ahead of time buying a

2    property in October of 2021 that it is going to

3    flood at a later date.

4  A  I don't believe that any human on the planet is

5    responsible for weather.

6  Q  Okay.  During this case --

7  A  Actually, I'm sorry, can I -- I do have

8    something I'd like to add to that statement, if

9    that's okay.

10 Q  If you've got more, you can say it.

11 A  My home, my personal home at 955 Brinsmere Drive

12   in Elm Grove, couple of crocks.  I had to do

13   rehab for it.  When the springtime is coming,

14   you know there's going to be a thaw.  You know

15   there's going to be water.  The priorities are

16   to mitigate that and have that in place.

17         I can remember some pretty big storms

18   that came through Elm Grove, and I made sure my

19   sump pumps were operational and I can mitigate

20   that water that would come in, which is

21   inevitable.  It enters your drain tile, it goes

22   to your crock and it gets pumped out.

23         That's not a mystery.  It happens

24   every year in Wisconsin, right.  That's home

25   maintenance.  That's rehab.  That's

1    construction.  You manage your project.

2                    I've had multiple flips in Wisconsin.

3    They start in the winter and open up in the

4    spring, and that was just always a priority for

5    me, like, that's just managing your project.

6  Q   Okay.  And Chris --

7  A   Excuse me?

8  Q   Anything further?  I want to make sure you've

9    had a chance to finish your --

10 A   I feel that if -- the person managing that

11   construction, that's their responsibility.

12                   (Exhibit Nos. 3 and 4 were marked.)

13 BY MR. SCHMIT:

14 Q   All right.  Let's look at these responses that

15   were provided.  These were the responses that I

16   received from your counsel.  This will be

17   Exhibit 3 dated December 13th, 2024.

18                   There's an unsigned verification as

19   to the responses, and I just want to make sure

20   because this was -- the next document, part of

21   it, the verification, this is how it was

22   received.

23                   Can you confirm for me, Mr. Ramirez,

24   that this verification, Exhibit 4, is, in fact,

25   the verification for those responses, Exhibit 3?

```
 1        Are you there?
 2                    MR. ROBINSON:  Markos, are you there?
 3                    (Zoom technical difficulty.)
 4   BY MR. SCHMIT:
 5   Q   All right, Mr. Ramirez.  Welcome back.  What I
 6       was showing before was a copy of the plaintiff's
 7       responses that were provided by your counsel,
 8       and I wanted to confirm that the verification
 9       that was also provided relates to those
10       responses.  Can you confirm that for me?
11   A   I don't understand the question.
12   Q   Well, let's take a look.  This is the document I
13       was provided with your signature down here.  So
14       is that your signature?
15   A   I can't see the document.
16   Q   Okay.  You're running into the same problems I
17       had when I got it.  Let me see --
18                    MR. ROBINSON:  You're not sharing
19       your screen, Evan.
20                    MR. SCHMIT:  Okay.  Super.  Now,
21       let's go through it.  All right.
22   BY MR. SCHMIT:
23   Q   Now can you see this document, Mr. Ramirez?
24   A   Yes.
25   Q   Is that your signature?
```

1   A    That is my signature.

2   Q    Okay.  And it says, as to responses, and it's

3        dated the 9th of December 2024; and you can see

4        here, it says, above that, "As to objections,"

5        with your counsel's electronic signature, but no

6        date.

7                  Now, I want to confirm this

8        verification pertains to the responses that were

9        produced by your counsel with a date of

10       December 13th.  Can you confirm that for me?

11  A    Andrew, you created that document, correct?  Can

12       you confirm that?

13                 MR. ROBINSON:  I can confirm that the

14       document we are viewing now is what was provided

15       to me from Mr. Ramirez.

16  BY MR. SCHMIT:

17  Q    All right.  I don't know how I'm supposed to

18       take that.

19                 Mr. Ramirez, did you furnish this

20       verification to your counsel for use in your

21       responses to the defendant's discovery?

22  A    Yes.

23  Q    Okay.  Sometimes what happens is we, as counsel,

24       provide drafts; and when it's time to get a

25       signature or we get an old draft or something,

1    and it doesn't always work out; but I just want

2    to make sure I wasn't going to run into any

3    issues where this verification isn't intended

4    for the responses that were received.  I think

5    we covered that, correct?

6  A  Yes.

7  Q  Earlier you said you thought that the loan you

8    provided covered about six months of mortgage

9    payments, correct?

10 A  Yeah, payments to Ben Savik (phonetic) on his

11    hard money loan, yeah.

12 Q  Okay.  Do you know when those payments -- did

13    East Town Management or Chris continue making

14    payments to Ben?

15 A  I don't have any verification, but that was my

16    understanding.  The way that the deal was

17    presented to me was that I would put up the

18    earnest money, the closing money and then make

19    certain amount of payments to reach the dollar

20    amount that's referenced in my mortgage, and

21    then I was good; I was done at that point.

22              All I needed to do at that point was

23    wait for the project to complete.  And so my

24    understanding was that, yeah, that was Chris's

25    responsibility.  Whether or not those were paid,

1    I don't know.

2  Q  Do you know approximately when Mr. Knight

3     occupied the Lone Tree property?

4  A  I mean, yeah, my understanding would have been

5     sometime at the end of 2022.  I don't know when

6     that happened.

7              I know when he first broached it with

8     me would have -- I believe would have been

9     August.  I did not receive any -- and that was

10    to purchase the property.  He never spoke to me

11    about moving into the property.  It just was

12    mentioned to me, and then I understood it; so I

13    found out after the fact.

14 Q  And do you recall approximately when after the

15    fact you learned that Mr. Knight was occupying

16    the Lone Tree property?

17 A  I think, like, October, November of 2022;

18    somewhere in there.

19 Q  Do you dispute that Chris or East Town

20    Management made renovations to the Lone Tree

21    property?

22 A  No.

23 Q  And do you dispute that those renovations were

24    made with the intention of flipping the

25    property?

1  A    No, that was my understanding.  It was to

2       rehabilitate the property, to flip it, list it

3       for sale.

4  Q    And there's a response here to Interrogatory

5       No. 5.  I'm going to scroll to that for you.

6                   Interrogatory 5 asked you to

7       "Identify any Documents in support of

8       Plaintiff's allegation in paragraph 9 of the

9       Complaint that had he known the Defendant 'told

10      the truth to [Plaintiff] that he would utilize

11      [Plaintiff]'s loan to purchase the Flip Property

12      in order to make it his personal residence,

13      [Plaintiff] would never have made the loan.'"

14                   And the response:  "All documents

15      provided illustrate that the Defendant presented

16      the Flip Property as a short-term business

17      investment and not a personal loan to the

18      Defendant to pay for the Defendant's personal

19      lifestyle.  See, emails and the terms of the

20      Note."

21                   Can I ask, Mr. Ramirez, what do you

22      mean in your response pay for the defendant's

23      personal lifestyle?

24  A    Andy?

25                   MR. ROBINSON:  The question is not to

1    me, Mr. Ramirez.  You have to --

2                    THE WITNESS:  Okay.

3                    MR. ROBINSON:  -- answer.

4                    THE WITNESS:  Okay.  My view of that

5    is this was an investment property.  This was

6    not Chris's personal home.

7                    This was a property to purchase,

8    rehabilitate, list on the market as quickly as

9    possible and get the best offer that we can so

10   that I can be repaid, Ben could be repaid and

11   Chris can profit.  That was my understanding.

12   BY MR. SCHMIT:

13   Q   All right.  And the money, again that you

14       provided, went directly to Ben for his first

15       mortgage, correct?

16   A   A portion of it, yeah.

17   Q   And to the extent it was a six-month period,

18       closed in October, we've got maybe sometime in

19       April, you're saying you became aware of or

20       learned that Mr. Knight had occupied the

21       property sometime in -- I think it was October,

22       November of '22 you were saying?

23   A   Yes.

24   Q   Let's assume that's when he occupied it.  Prior

25       to occupying the property, he would have had a

1        personal residence, correct?

2    A   Yes.

3    Q   Different than the Lone Tree property, right?

4    A   Correct.  That's the one I referenced earlier.

5    Q   So how if he has a personal residence that he's

6        occupying, presumably paying for, how are you

7        funding anything to do with this personal

8        lifestyle by making the mortgage payments to

9        Ben?

10   A   Ben moved into the house and became a squatter.

11   Q   You mean Chris moved into the house?

12   A   Yeah, yeah.  My apologies.  I misspoke on that.

13       Chris Knight moved into the property and made it

14       his personal home.  That was never a part of the

15       deal.

16   Q   Right.  And over that one-year period from the

17       closing -- actually, let's just expand it

18       because it was eight months to -- 20 months

19       between February of 2021 when he approached you

20       and later in 2022 when he's occupying the

21       property, there's changes in circumstances that

22       occurred, correct?

23   A   That is what?  What circumstances changed?

24   Q   Well, let's talk what you said earlier.  You

25       didn't know about the foundation issues at the

1        time the property was purchased, correct?

2    A   That is correct.

3    Q   You didn't know the property was going to flood

4        after it was purchased, correct?

5    A   Correct.

6    Q   There's also the fact that the closing -- I

7        mean, we talked about a purchase in February.

8        The closing doesn't occur until October,

9        correct?

10   A   Correct.

11   Q   And I understand that you're talking about a

12       six-month purchasing price, but isn't it true

13       that really from the get-go Mr. Knight had

14       always been discussing it as a 12-month window?

15   A   I would not argue that.  That is correct, sir.

16       My estimation was ideally list it in spring of

17       2022, but Chris was upfront with me that that

18       might take more time.  And I was, you know -- I

19       was understanding.  I do projects.  I know that

20       they don't go perfect, which is why I -- I did

21       not reach out for an attorney until Chris did.

22       I was being patient.  I was very patient this

23       entire time.

24   Q   Twenty-seven of the complaint states, not only

25       did debtor fraudulently obtain and extend his

```
 1    loan from Ramirez, the debtor never intended to
 2    the flip the flip property.  His actions also
 3    indicate that he never intended to repay the
 4    loan.
 5              Mr. Ramirez, is it your belief that
 6    Chris never intended to repay you for the loan
 7    on Lone Tree?
 8  A  I haven't been repaid.  I don't have anything
 9    that would show me otherwise.
10  Q  Well, I understand that you weren't repaid; but
11    what your complaint alleges -- and what I'm
12    asking is, if it's your belief that in February
13    of 2021 when Mr. Knight approached you about the
14    Lone Tree property, it was his intent never to
15    repay you on the $75,000 investment?
16  A  His actions show me that.  He became a squatter
17    in the home that's our flip house and never paid
18    me any money.
19  Q  Let me ask you this:  You had previously done
20    business with Mr. Knight prior to the
21    February 2021 business dealing, right?
22  A  Uh-huh.
23  Q  Now, I assume that his actions prior to February
24    of 2021 offer on Lone Tree, everything prior to
25    that, all your business dealings would suggest
```

1   to you that he did intend to pay that $75,000

2   loan; is that fair?

3   A   No, that's inaccurate because he's never paid

4   any money to me.  I was the customer.  I was

5   paying him for services.

6   Q   So maybe I'll try this again.

7           Based on your business dealings with

8   Mr. Knight up to your February of 2021 offer on

9   the Lone Tree property, did you believe he

10   intended to repay you the $75,000 at that time?

11   A   Yeah, when he and I spoke of it, I did believe

12   that.  I think that was a mistake, but I did

13   believe that then.

14   Q   Right.  You're saying now, with the benefit of

15   time, in hindsight you don't believe he intended

16   to repay you?

17   A   That's correct.

18   Q   And that's based on the fact that he hasn't

19   repaid you, correct?

20   A   Yeah, we had -- we had other deals he also

21   floundered on and didn't pay me.  We were able

22   to come to an agreement with those, and he

23   returned my initial investments; but for two

24   years he dragged multiple deals of ours through

25   the mud and made no money.

1        I'll be really clear, too.  I offered

2    to help him.  I'm a good general contractor.  I

3    have subcontractors.  I offered to give any

4    support he needed to make those deals and Lone

5    Tree work, and he rebuffed that at every turn.

6        In retrospect, now I feel that's

7    because I was being defrauded.  He didn't want

8    me involved, and that's based on all the

9    failings that have happened since February of

10   2021.

11 Q  Well, in Interrogatory No. 10 on your screen you

12   were asked to identify any documents in support

13   of plaintiff's allegation that defendant

14   fraudulently obtained and extended a loan from

15   plaintiff as alleged in paragraph 27 of the

16   complaint.

17       In response to that request, you say

18   review all documents provided.  Now, I can't

19   tell from that response what, if any, of these

20   documents that were provided actually are

21   intended to identify any support for paragraph

22   27 here regarding the defendant fraudulently

23   obtaining or extending the loan from the

24   plaintiff.

25 A  No.

1  Q   Let's review those.  We go back to our mortgage

2      and mortgage note.

3              Mr. Ramirez, are you able to tell me

4      whether or not this document is responsive to

5      Interrogatory No. 10?

6  A   That's the only document that I have that is for

7      the deal.  It's a legal document.

8  Q   Okay.  And can you explain to me how that

9      evidence supports your allegations that the

10     defendant fraudulently obtained an extended loan

11     from you?

12 A   I mean, I think what makes it fraudulent is his

13     admission that he planned on living in the

14     house, and he never told me that; and then he

15     moved into it.

16 Q   When did he move into it?

17 A   Again, I don't know when he moved into it.  I

18     have some idea of when that was clear to me and

19     evident because he mentioned it which would have

20     been in late 2022.

21 Q   You also produced an appraisal.  Is this

22     responsive to Interrogatory 10 of the documents

23     that were provided?

24 A   I mean, for me the way I look at the appraisal

25     is it shows that he did not fulfill his

1      agreement on rehabilitating the property or

2      listing it for sale.

3  Q  Now, can you explain that to me?  How does the

4      appraisal in 2024 indicate that the defendant

5      here fraudulently obtained and extended the loan

6      from Mr. Ramirez?

7  A  It just shows the project wasn't completed.  I

8      mean, he moved into the house without completing

9      the project.  I mean, that's kind of odd to me

10     because it's not what we discussed.  It's not

11     what our agreement was for.

12  Q  That's a good point.  You said you had purchased

13     a property in Elm Grove, rehabilitated it, and

14     then you occupied it, correct?

15  A  That was the purpose of that.  That was my

16     personal primary home that -- my wife wanted to

17     be in that neighborhood.

18  Q  And you waited until the rehab was completed

19     before you occupied it, correct?

20  A  Yeah.  I waited for occupancy and the home to be

21     complete so we can move into it.

22  Q  That's what you would expect if in the normal

23     course of order for someone who is buying a

24     home, repairing it and choosing to occupy it,

25     correct?

1    A    I can't speak for what other people do.  That's

2         how I handled it.  My expectation is that the

3         project would be complete.  It's a complete

4         home.  The appraisal for me, what it shows, it's

5         not a complete home.  It's not completed.

6    Q    We'll look at the last of the documents that

7         were produced in discovery, and we have

8         emails -- an email dated December 2, 2021, Elm

9         Grove pics.  Looks like this is from Mr. Knight

10        to you; is that correct?

11   A    I believe so.

12   Q    And I assume when it says Elm Grove pics, are

13        these pictures of Lone Tree that Mr. Knight was

14        providing you?

15   A    I believe so.

16   Q    Can you tell what's going on in that first

17        picture?

18   A    It's hard to tell.  It looks like just the yard

19        is kind of a mess.

20   Q    We'll zoom that in a little for you.  Is that

21        any better?

22   A    Yeah.  Not -- not really, but it looks like a

23        bunch of refuse, many things that were brought

24        out from the home that are in the yard.

25   Q    What about this second picture; can you tell?

1  A    This is the facade of the property with a ladder
2       up.
3  Q    Do you know why Mr. Knight -- or do you have a
4       belief as to why Mr. Knight was providing you
5       with these photos?
6  A    I was asking for them.  I felt that I had given
7       lots of patience, and there wasn't production.
8               In my business what I do is manage,
9       and the only way that I could manage this
10      situation was by requesting phone calls.  We did
11      monthly phone calls and then requesting
12      pictures, but it just became really apparent to
13      me that nothing was moving forward.
14              And so then I kept pressing for
15      updates.  I wanted things to progress.  I needed
16      this to get to the finish line.
17 Q    Well, in December of 2021, that's only two
18      months after the closing if it closed in
19      October, correct?
20 A    Uh-huh.
21 Q    So were you -- were you already pressing for
22      more photos and more information in December?
23 A    No, that would have been, like, a year -- that
24      would have been after August of 2022 when I was
25      feeling really pressed.

1            The initial ask is -- because it's

2      like a normal procedure.  The only way for me to

3      see this process on this project would be based

4      on calls with Chris or photos.

5   Q  And then --

6   A  So it looks like demolition now that we're, you

7      know, hashing out this conversation.  It looks

8      like it was demolition to the property to

9      prepare it for the next phase.

10  Q  So from these documents it looks like things

11     are, would you agree, kind of going in the

12     normal course?

13  A  Yeah.  Definitely.

14  Q  So going back to Interrogatory 10, these

15     documents aren't showing anything relevant to a

16     response as far as defendant fraudulently

17     obtaining or extending the loan from plaintiff,

18     correct?

19  A  I'm sorry, can you repeat that?

20  Q  Sure.  Your response here is "Review all

21     documents."  We're kind of doing that right now

22     because I don't see any of these documents that

23     really respond to this; but, in particular, it

24     would seem like photos in December of 2021

25     showing the demolition that's expected at the

1    property really don't support any allegation

2    that defendant fraudulently obtained and

3    extended the loan; is that fair?

4  A   Yeah.  Like I said before, what to me

5    constituted it is what his actual actions were

6    later in the process.

7  Q   Well, let me just be clear here.  You're talking

8    about the final result, right, that you didn't

9    get paid, correct?

10  A   Well, he didn't complete the project, and he's a

11    squatter in it now.

12  Q   That's it.  The fact that you didn't get paid,

13    and he's occupying the property and the repairs

14    haven't been finished, correct?

15  A   Correct.  It's a breach of contract.

16  Q   Anything else?

17  A   No.

18  Q   That's a --

19  A   No.  That's a no, sir.

20         (Exhibit No. 5 was marked.)

21  BY MR. SCHMIT:

22  Q   Thank you.  Then I'm scrolling on to page

23    [sic] 5, an email dated February 7th, 2021 from

24    Mr. Knight to you.  It states, hello, when you

25    look at these, remember a few things; almost an

1    acre, two full baths, two half baths, 4,300 SF

2    finished, Cape Cod, lots of curb appeal and all

3    in for 600K including your profit.  This is a

4    cannot lose.  First money in; first money out.

5    Chris.

6              This is shortly after, I think, that

7    email that you inserted into your complaint,

8    correct?

9  A    Yes.

10 Q    And if I go down more, I see February 7th on

11     flexmls.com, is it fair to assume this is the

12     link to the Lone Tree property?

13 A    That or it could be comps.  I always asked for

14     comps.

15 Q    Okay.

16 A    So I'm not sure what exactly that link was.

17 Q    Now, we find, on page 7, this is the email that

18     was inserted, correct --

19 A    Correct.

20 Q    "Lone Tree Docs.  Take a look.  I will call you

21     later."  This ends -- and I don't know if there

22     are any docs -- but do you have any idea what

23     would have been attached, if anything was

24     attached to this email?

25 A    I don't know.  I mean, I don't know.

1  Q   Now, I have a text.  This looks like it was

2      later, December 9th, 2022, from Chris -- or, no,

3      it's an email --

4  A   That an email, yeah.

5  Q   -- to you saying that he's met with an attorney.

6              Is it safe to say this is at a point

7      where your relationship has deteriorated, and it

8      was beginning to fall apart?

9  A   No, that was my birthday.  That was the day --

10     that was supposed to be our monthly call, and he

11     hadn't called me; and so I sent a couple text

12     messages to say, hey, I'm ready -- ready for our

13     call.

14             I will preface it as well that what

15     led to this conversation -- and there's other

16     texts to support it -- was Chris mentioning that

17     he would get his refi, he would close it, he

18     would pay me; and that if he couldn't, he would

19     list it in the spring.

20             And so now fast forward approximately

21     60 days, we get to this point.  I'm anticipating

22     that he and I are getting on a call to kind of

23     review where things are standing.  He replies to

24     my text message saying, I sent an email, and

25     then that -- that was the email I saw.

1               That was the first time that, you

2        know, he -- I believe that I responded to his

3        email with, okay, we'll let the attorneys figure

4        it out.  That's when I started to reach out to

5        Ajay and ultimately be in contact with

6        Mr. Robinson.

7    Q   And then you filed suit in January of 2023,

8        correct?

9    A   That sounds correct.

10   Q   All right.  And after you initiated the

11       foreclosure case against Mr. Knight and East

12       Town Management, it's my understanding there was

13       also some other litigation, two other lawsuits

14       that were filed; is that correct?

15   A   I can recall one which would have been for the

16       South 9th property.

17   Q   Well, there's one lawsuit I saw that was you and

18       Mr. Wycklendt?

19   A   Oh, that would have been for -- that would have

20       been State Street, and that got settled.

21   Q   And then this other litigation.  So if I recall,

22       it was something like a lawsuit in January, a

23       lawsuit in April and then a lawsuit in June,

24       correct?

25   A   I don't recall the dates.

1              MR. SCHMIT:  Okay.  We were looking

2      at the emails and texts and -- I'm sorry,

3      Sheryl, I can't keep track where we are now.  I

4      think this was initially going to be my

5      Exhibit 5, but I think -- I think we might be at

6      six.  I can't recall.

7              (Discussion held off the record.)

8              (Exhibit No. 6 was marked.)

9  BY MR. SCHMIT:

10  Q    There's a few other text messages here.

11      November 22.  Looks like you're saying to

12      Mr. Knight, at the lower portion of the text

13      message, that he stated on your call, there's no

14      way he could list the home for sale given the

15      condition of the yard and not being completed.

16      Our deal was to flip the house.  Plan was to

17      list in August.  I have no problem with you

18      keeping the house.  I'm happy for your family to

19      be in the home, but you aren't able to get the

20      mortgage, it seems.  How do we move forward.  I

21      need this resolved.  That's November of 2022,

22      correct?

23  A    Yeah, that makes sense.

24  Q    So, again, what you said earlier, you don't

25      really care if he keeps the house --

1  A    No.

2  Q    -- as long as you're getting paid, right?

3  A    This is correct, sir.

4  Q    Okay.

5  A    Doesn't matter to me who purchases the property.

6  Q    Now, we're moving on to our next exhibit.

7             These are documents that were

8       produced by the defendant in this case,

9       additional text messages.

10            So we've got Chris sending to you --

11      Chris in the blue, you in the gray.  I'll

12      represent that, all right.

13            Now, Mr. Ramirez, if I look at page 1

14      here, on November 2, 2021 -- it's the start of

15      this text message -- and I think I can presume

16      anything before that predates November 2, 2021,

17      at least at that time, okay.

18            You're stating in that response here,

19      that gray area, that doesn't change the fact

20      that six months to refi is not accurate, and I

21      question your ability to pull these loans as you

22      said you would.  I don't blame you for that, but

23      it's reality.

24            And Mr. Knight comes back to say,

25      well, I guess I can prove you wrong on that very

1     shortly.  No issue refinancing; just have to

2     meet everybody's stupid guidelines.  We are good

3     at the bank.  You say, we will see, right?

4  A  Doesn't seem like that was accurate.

5  Q  Well, did I read it accurate is the first

6     question.

7  A  Yeah, you read it accurately.

8  Q  Okay.  As it turns out, you're saying Mr. Knight

9     was not able to get that -- that refinancing

10    that he thought he would be able to get, right?

11 A  Correct.

12 Q  I guess here, though, based on this message, it

13    would appear as of -- at least before this

14    November 2, 2021 time, you were in discussions

15    with Mr. Knight; and he was telling you that he

16    intended to refi you out, correct?

17 A  Correct.

18 Q  And that would have been less than a month of

19    that -- than that October date for closing,

20    correct?

21 A  Can you blow that up?  It's really tiny.  I

22    don't think that that's in reference to Lone

23    Tree.  That's in reference to the properties

24    that we had together that he was supposed to

25    refi for us to hold.

1   Q   That's what you think?

2   A   Yeah, that's a totally different topic.

3   Q   Okay.  And then earlier -- this is page 2

4       here -- there's a discussion of a 12-month

5       period with Lone Tree.

6               This is consistent with what you were

7       saying before; that Chris was forthcoming with

8       you in saying that this is really a 12-month

9       project not a 6-month project, correct?

10  A   Let me read it, or do you want to read it?

11  Q   No, you can.

12  A   Do you want me to read it out loud?

13  Q   No.

14  A   Yeah, I mean, that was us discussing from the

15      get-go; I always felt there was no reason this

16      should be a 12-month project.  I like listing in

17      spring.  If you understand Wisconsin real

18      estate, having a project that's ready in August

19      sucks because you're about to go into the worst

20      time of the year to sell.

21              So I was always hoping that he would

22      get on the horse, get this project ready and

23      listed in April.  When that did not occur, I

24      understood.  It wasn't contentious at that

25      point, you know.  I understood.

1              But I always listen, and I stand by

2       my statement there; if you're going to run

3       projects, you've got to push; you've got to

4       drive; you've got to perform.  That's what that

5       was.

6   Q   My question was:  This text message here is

7       consistent with what you testified earlier that

8       Mr. Knight was upfront with his estimate that

9       the project would take 12 months?

10  A   That it could, yeah.

11  Q   Page 3 is a text message exchange in February --

12      September 12, 2022.  The first comment there,

13      message from Mr. Knight states, moving tomorrow,

14      3 inches of water in basement, going to be

15      Thursday.  And then, that's no good.  Old house

16      or new house, is your response.  New, long

17      story.  Explain next week.

18              Mr. Ramirez, do you know if the new

19      house that Mr. Knight is referring to was the

20      Lone Tree property?

21  A   I don't know.  That was vague.  I can't answer

22      that.

23  Q   You don't recall?

24  A   I don't.

25              (Exhibit No. 7 was marked.)

```
 1  BY MR. SCHMIT:

 2  Q   Our next exhibit here, Exhibit 7, I'll

 3      represent, Mr. Ramirez, this is the proof of

 4      claim that you filed in the East Town

 5      Management, LLC Chapter 11 case.  All right.

 6      I'm going to scroll to page 3.  That's your

 7      signature, correct?

 8  A   Yes.

 9  Q   Total amount of the claim was $160,855.25.  I'm

10      going to scroll down to the support that was

11      filed with this statement.

12              Am I to understand from this

13      statement again that of the $160,855.25, the

14      principal here, the $75,000, represents the

15      amount that was obtained by East Town Management

16      from you for the Lone Tree property?

17  A   Yes.

18              MR. SCHMIT:  No further questions.

19      Andy?

20              MR. ROBINSON:  Nothing from me.

21              (Proceedings concluded at 2:15 p.m.)

22

23

24

25
```

Cream City Reporting, LLC
414.585.8128

```
 1  STATE OF WISCONSIN    )
                          )SS:
 2  COUNTY OF MILWAUKEE   )

 3

 4

 5              I, Sheryl L. Stawski, a Registered

 6  Professional Reporter and Notary Public in and for

 7  the State of Wisconsin, do hereby certify that the

 8  deposition of MARKOS JESUS RAMIREZ was recorded by

 9  me on the 12th day of March, 2025, and reduced to

10  writing under my personal direction.

11              I further certify that I am not a

12  relative or employee or attorney or counsel of any

13  of the parties, or a relative or employee of such

14  attorney or counsel, or financially interested

15  directly or indirectly in this action.

16              In witness whereof, I have hereunder

17  set my hand and affixed my seal of office at

18  Milwaukee, Wisconsin, this 20th day of March, 2025.

19

20

21              _____
                             Notary Public
22                  In and for the State of Wisconsin

23

    My commission expires:  September 24, 2026.
24

25
```

## WORD INDEX

**< $ >**
**$100,000** 17:*4*
**$150,000** 16:*2*
**$160,855.25** 63:*9*, *13*
**$75,000** 15:*25* 16:*13*
  17:*15* 46:*15* 47:*1*, *10*
  63:*14*
**$900,000** 18:*12*

**< 1 >**
**1** 2:*1* 22:*17*, *19* 31:*2*
  33:*15* 59:*13*
**1:00** 1:*1*
**10** 13:*10* 14:*12*
  15:*19* 48:*11* 49:*5*, *22*
  53:*14*
**100** 25:*15*
**11** 10:*8* 63:*5*
**12** 62:*9*, *12*
**12-month** 45:*14*
  61:*4*, *8*, *16*
**12th** 1:*1* 64:*9*
**13** 33:*22*
**13th** 31:*7*, *8* 37:*17*
  39:*10*
**15** 7:*13*

**< 2 >**
**2** 2:*1* 30:*19*, *22* 34:*7*
  51:*8* 59:*14*, *16* 60:*14*
  61:*3*
**2:15** 1:*1* 63:*21*
**20** 5:*22* 12:*22* 44:*18*
**2009** 9:*17*
**2010** 6:*11* 7:*9*, *16*
**2014** 8:*4*, *25* 9:*16*, *18*
  10:*3*
**2016** 5:*12*, *16* 27:*16*
**2017** 5:*14*, *19*
**2018** 10:*1* 12:*23*
**2019** 12:*23*
**2020** 5:*4*, *23*, *24*
**2021** 10:*4* 17:*25*
  21:*13*, *14* 24:*23*
  28:*22* 31:*7*, *8* 36:*2*
  44:*19* 46:*13*, *21*, *24*
  47:*8* 48:*10* 51:*8*

52:*17* 53:*24* 54:*23*
  59:*14*, *16* 60:*14*
**2022** 35:*22* 41:*5*, *17*
  44:*20* 45:*17* 49:*20*
  52:*24* 56:*2* 58:*21*
  62:*12*
**2023** 57:*7*
**2024** 32:*21* 33:*23*
  34:*1* 37:*17* 39:*3*
  50:*4*
**2025** 1:*1* 64:*9*, *18*
**2026** 64:*22*
**20-percent** 14:*14*
**20th** 64:*18*
**22** 2:*1* 29:*21* 43:*22*
  58:*11*
**23121** 5:*1*
**24** 33:*21* 64:*22*
**24-02105-RMB** 1:*1*
**24-22327-RMB** 1:*1*
**27** 48:*15*, *22*

**< 3 >**
**3** 2:*1* 37:*12*, *17*, *25*
  62:*11*, *14* 63:*6*
**30** 2:*1* 6:*22*, *23*
  21:*23*
**30-percent** 14:*15*
**37** 2:*1*
**370** 25:*14*

**< 4 >**
**4** 2:*1* 31:*19* 37:*12*,
  *24*
**4,300** 55:*1*
**400** 2:*1*

**< 5 >**
**5** 2:*1* 42:*5*, *6* 54:*20*,
  *23* 58:*5*
**53202** 2:*1*
**54** 2:*1*
**59** 2:*1*
**5th** 17:*25* 24:*23*
  28:*22*

**< 6 >**
**6** 2:*1* 58:*8*
**60** 21:*23* 56:*21*

**600K** 55:*3*
**63** 2:*1*
**6-month** 61:*9*

**< 7 >**
**7** 1:*1* 2:*1* 55:*17*
  62:*25* 63:*2*
**70th** 12:*7*
**731** 2:*1*
**75,000** 16:*2*
**7th** 54:*23* 55:*10*

**< 8 >**
**839** 2:*1*
**850** 18:*11* 25:*9*, *15*
**85383** 5:*2*

**< 9 >**
**9** 42:*8*
**900** 2:*1*
**900,000** 25:*9*
**900K** 25:*15*
**955** 36:*11*
**9-8** 5:*1*
**98th** 5:*1*
**9th** 39:*3* 56:*2* 57:*16*

**< A >**
**ability** 59:*21*
**able** 21:*14* 22:*21*
  36:*1* 47:*21* 49:*3*
  58:*19* 60:*9*, *10*
**accurate** 26:*7* 59:*20*
  60:*4*, *5*
**accurately** 26:*15*
  60:*7*
**acre** 55:*1*
**acronyms** 8:*23*
**action** 64:*15*
**actions** 46:*2*, *16*, *23*
  54:*5*
**actual** 14:*23* 54:*5*
**add** 36:*8*
**additional** 59:*9*
**address** 4:*25*
**addressed** 20:*17*, *18*
**admission** 49:*13*
**ADVERSARY** 1:*1*
  11:*19*

**advised** 12:*2* 14:*20*,
  *22* 32:*17*
**affidavit** 33:*9*
**affixed** 64:*17*
**agent** 12:*2*
**agree** 23:*16* 35:*25*
  53:*11*
**agreement** 30:*25*
  33:*5* 47:*22* 50:*1*, *11*
**agreements** 14:*17*
**ahead** 6:*16* 26:*1*, *9*
  27:*8* 30:*21* 35:*21*
  36:*1*
**Ajay** 31:*21* 57:*5*
**allegation** 23:*8* 42:*8*
  48:*13* 54:*1*
**allegations** 23:*5* 49:*9*
**alleged** 48:*15*
**alleges** 46:*11*
**all-in** 18:*8*
**Amherst** 6:*8*
**amount** 17:*1*, *14*
  19:*9* 40:*19*, *20* 63:*9*,
  *15*
**ANDREW** 2:*1* 14:*4*
  39:*11*
**Andy** 26:*23* 42:*24*
  63:*19*
**answer** 4:*2*, *17* 26:*1*,
  *9* 27:*8* 35:*13* 43:*3*
  62:*21*
**anticipating** 56:*21*
**anyways** 11:*18*
**apart** 56:*8*
**apologies** 44:*12*
**apparent** 52:*12*
**appeal** 55:*2*
**appear** 31:*13* 60:*13*
**Appeared** 2:*1*
**appears** 34:*8*
**appraisal** 33:*16*, *18*,
  *23* 34:*1* 49:*21*, *24*
  50:*4* 51:*4*
**Appraisals** 33:*24*
**approached** 44:*19*
  46:*13*
**appropriate** 35:*15*, *16*
**approximately** 8:*4*
  12:*20* 13:*16* 41:*2*, *14*
  56:*20*

April 43:*19* 57:*23* 61:*23*
area 15:*14* 19:*23* 20:*12* 34:*10* 59:*19*
argue 45:*15*
Arizona 4:*21* 5:*2, 3, 8* 10:*24* 11:*5* 27:*20*
ARV 25:*15, 16*
ascertain 33:*20*
asked 26:*24* 30:*4, 5* 42:*6* 48:*12* 55:*13*
asking 4:*1* 27:*14* 35:*25* 46:*12* 52:*6*
assume 4:*2* 5:*17* 43:*24* 46:*23* 51:*12* 55:*11*
assumption 35:*20*
attached 55:*23, 24*
attention 19:*16*
attesting 33:*9*
Attorney 2:*1* 4:*11* 14:*18, 20* 22:*6, 11, 25* 31:*1, 21, 23* 32:*1, 3, 4* 45:*21* 56:*5* 64:*12, 14*
attorneys 57:*3*
August 30:*3* 41:*9* 52:*24* 58:*17* 61:*18*
Aunt 11:*16*
available 10:*23*
aware 33:*11* 35:*3* 43:*19*

< B >
back 9:*13, 19* 16:*1* 27:*11* 28:*21* 29:*8, 20* 33:*15* 38:*5* 49:*1* 53:*14* 59:*24*
background 4:*21* 6:*3* 11:*6, 18*
balance 16:*18*
ballpark 10:*5*
bangs 19:*22*
bank 60:*3*
BANKRUPTCY 1:*1* 11:*21*
based 29:*4* 47:*7, 18* 48:*8* 53:*3* 60:*12*
basement 20:*21* 34:*8, 11, 17, 18* 35:*12*

62:*14*
Basements 35:*13*
basic 18:*2*
basically 13:*10*
bathroom 20:*9*
bathrooms 7:*19*
baths 55:*1*
Bay 19:*14, 21, 22*
beginning 56:*8*
behalf 2:*1*
belief 46:*5, 12* 52:*4*
believe 5:*12* 8:*5* 13:*25* 14:*13* 17:*4, 24* 18:*11* 30:*2, 25* 32:*17* 33:*19* 34:*23* 36:*4* 41:*8* 47:*9, 11, 13, 15* 51:*11, 15* 57:*2*
Ben 13:*11* 15:*20* 16:*21* 17:*2* 40:*10, 14* 43:*10, 14* 44:*9, 10*
benefit 47:*14*
Ben's 16:*18* 17:*11*
best 7:*17* 8:*12, 22* 19:*19* 32:*5* 43:*9*
better 51:*21*
big 36:*17*
birthday 56:*9*
bit 6:*16* 12:*9* 30:*21*
blame 59:*22*
blocks 20:*11* 28:*20*
blow 60:*21*
blue 59:*11*
bottom 7:*19* 22:*24*
box 24:*22*
breach 54:*15*
brief 17:*24* 18:*7*
bring 28:*13*
bringing 13:*8*
Brinsmere 36:*11*
broached 41:*7*
brought 51:*23*
budget 16:*20, 21*
building 9:*25* 10:*1*
buildings 10:*9*
Bullet 34:*7*
bunch 51:*23*
business 13:*17* 16:*18* 33:*8, 10* 42:*16* 46:*20, 21, 25* 47:*7* 52:*8*

businesses 13:*23*
buy 28:*14* 30:*13*
buyer 30:*6*
buying 35:*19* 36:*1* 50:*23*
buys 30:*8, 10*

< C >
call 11:*14* 15:*4, 11* 17:*19, 21* 24:*16* 55:*20* 56:*10, 13, 22* 58:*13*
called 3:*2* 7:*7* 30:*3* 56:*11*
calls 52:*10, 11* 53:*4*
Campbell 11:*12*
candy 10:*18*
Cape 55:*2*
capital 9:*21* 19:*10*
capture 3:*24*
care 30:*8, 10, 16* 58:*25*
CASE 1:*1* 11:*21* 14:*23* 22:*13* 23:*3* 36:*6* 57:*11* 59:*8* 63:*5*
center 11:*2*
certain 9:*12* 16:*25* 40:*19*
certification 11:*3*
certify 64:*7, 11*
chance 37:*9*
change 59:*19*
changed 44:*23*
changes 44:*21*
Chapter 1:*1* 63:*5*
cheaper 9:*7*
checks 28:*13*
choosing 50:*24*
Chris 11:*23, 24* 12:*2, 4, 10, 14, 21* 14:*10* 15:*10* 16:*5* 20:*2, 5, 10* 21:*5, 20* 28:*22* 29:*18* 34:*24* 35:*11, 25* 37:*6* 40:*13* 41:*19* 43:*11* 44:*11, 13* 45:*17, 21* 46:*6* 53:*4* 55:*5* 56:*2, 16* 59:*10, 11* 61:*7*

Chris's 40:*24* 43:*6*
CHRISTOPHER 1:*1*
CHST 11:*3*
circumstances 20:*23* 44:*21, 23*
City 6:*13* 7:*23*
Civil 1:*1*
Claim 2:*1* 63:*4, 9*
clear 13:*8* 16:*12* 17:*14* 28:*22* 48:*1* 49:*18* 54:*7*
Clearly 29:*24*
close 21:*15, 18* 56:*17*
closed 16:*1* 21:*10, 24* 43:*18* 52:*18*
closes 30:*17*
closing 21:*11* 22:*2* 31:*12* 35:*2, 3* 40:*18* 44:*17* 45:*6, 8* 52:*18* 60:*19*
club 7:*7*
CNR 8:*17, 21*
Cod 55:*2*
combination 8:*2*
come 9:*13* 36:*20* 47:*22*
comes 59:*24*
comfortable 15:*3* 21:*6*
coming 36:*13*
commencing 1:*1*
comment 34:*4* 62:*12*
commercial 9:*24*
commission 64:*22*
communication 25:*2*
companies 7:*15*
company 7:*16* 8:*9, 10, 19* 10:*17* 17:*11*
Complaint 2:*1* 23:*2* 24:*20* 33:*22* 42:*9* 45:*24* 46:*11* 48:*16* 55:*7*
complete 40:*23* 50:*21* 51:*3, 5* 54:*10*
completed 50:*7, 18* 51:*5* 58:*15*
completing 50:*8*
completion 20:*19*
comps 19:*1* 55:*13, 14*

**concern** 20:*22*
**concluded** 63:*21*
**concluding** 1:*1*
**condition** 19:*25*
58:*15*
**confirm** 37:*23* 38:*8*,
*10* 39:*7, 10, 12, 13*
**confirmed** 17:*22*
**consistent** 33:*25*
61:*6* 62:*7*
**constituted** 54:*5*
**constitutes** 26:*21*
**construction** 6:*10, 12*
7:*10, 11, 15* 8:*17*
11:*2* 13:*3, 13* 35:*4,*
*15* 37:*1, 11*
**contact** 57:*5*
**contentious** 61:*24*
**continue** 40:*13*
**continues** 31:*3*
**contract** 8:*2* 14:*19*
54:*15*
**contractor** 8:*19*
12:*10* 48:*2*
**contracts** 14:*3, 11*
**control** 35:*11*
**conversation** 24:*3, 9,*
*11* 25:*5* 29:*1, 4, 6, 11*
53:*7* 56:*15*
**cookies** 19:*21*
**copy** 38:*6*
**correct** 4:*22, 23* 5:*19,*
*20* 9:*1* 11:*9* 13:*5, 6*
16:*14, 19, 20, 22*
17:*10, 12, 13, 16, 17*
21:*12, 17* 23:*20*
24:*16, 17, 18, 19*
25:*23* 26:*17, 18* 27:*3,*
*18, 23, 24* 28:*3* 30:*16*
31:*4, 5, 15, 17, 18, 25*
33:*6, 7, 10, 13, 14, 17*
34:*3* 39:*11* 40:*5, 9*
43:*15* 44:*1, 4, 22*
45:*1, 2, 4, 5, 9, 10, 15*
47:*17, 19* 50:*14, 19,*
*25* 51:*10* 52:*19*
53:*18* 54:*9, 14, 15*
55:*8, 18, 19* 57:*8, 9,*
*14, 24* 58:*22* 59:*3*

60:*11, 16, 17, 20* 61:*9*
63:*7*
**correctly** 14:*6*
**cosmetic** 20:*15, 19*
**costs** 18:*8*
**Coulter** 8:*23, 24*
**counsel** 4:*10* 14:*7,*
*10* 37:*16* 38:*7* 39:*9,*
*20, 23* 64:*12, 14*
**counsel's** 39:*5*
**COUNTY** 64:*2*
**couple** 7:*21* 14:*13*
18:*1* 23:*5* 28:*20*
30:*3* 36:*12* 56:*11*
**course** 50:*23* 53:*12*
**COURT** 1:*1* 4:*14*
**cousin** 11:*17*
**covered** 40:*5, 8*
**crazy** 9:*18*
**created** 39:*11*
**credit** 9:*23*
**crisis** 9:*17*
**crock** 36:*22*
**crocks** 36:*12*
**cry** 6:*21*
**Cudahy** 11:*25* 12:*21*
**curb** 55:*2*
**Currently** 11:*1*
**customer** 47:*4*
**customers** 8:*6*
**cut** 34:*24*

**< D >**
**D&M** 10:*17*
**damage** 34:*23*
**damaged** 34:*10* 35:*2*
**Dan** 32:*10*
**Daniel** 32:*5*
**data** 11:*2*
**date** 12:*24* 36:*3*
39:*6, 9* 60:*19*
**dated** 31:*7* 37:*17*
39:*3* 51:*8* 54:*23*
**dates** 18:*3* 57:*25*
**day** 1:*1* 56:*9* 64:*9,*
*18*
**days** 21:*23* 56:*21*
**deal** 14:*12* 16:*3, 11*
21:*10, 24* 24:*11, 18*
28:*23* 31:*1* 32:*6*

40:*16* 44:*15* 49:*7*
58:*16*
**dealing** 46:*21*
**dealings** 8:*3* 46:*25*
47:*7*
**deals** 14:*8, 9* 32:*8*
47:*20, 24* 48:*4*
**dealt** 21:*9*
**Debtor** 1:*1* 23:*9, 22*
45:*25* 46:*1*
**December** 37:*17*
39:*3, 10* 51:*8* 52:*17,*
*22* 53:*24* 56:*2*
**decision** 21:*5*
**Defendant** 1:*1* 2:*1*
42:*9, 15, 18* 48:*13, 22*
49:*10* 50:*4* 53:*16*
54:*2* 59:*8*
**defendant's** 39:*21*
42:*18, 22*
**Definitely** 53:*13*
**defrauded** 48:*7*
**degree** 6:*4*
**delapidated** 19:*7*
**demolition** 53:*6, 8, 25*
**deposed** 3:*11*
**Deposition** 1:*1* 64:*8*
**described** 26:*15*
**desk** 15:*10*
**deteriorated** 56:*7*
**developed** 12:*18, 25*
13:*2*
**different** 14:*18* 44:*3*
61:*2*
**difficulties** 12:*10*
**difficulty** 38:*3*
**direction** 64:*10*
**directly** 17:*2, 8, 11*
43:*14* 64:*15*
**disagreement** 29:*14,*
*18*
**discovery** 20:*20*
34:*18* 39:*21* 51:*7*
**discuss** 30:*2*
**discussed** 50:*10*
**discussing** 45:*14*
61:*14*
**discussion** 31:*17*
58:*7* 61:*4*
**discussions** 60:*14*

**dispute** 23:*12* 41:*19,*
*23*
**distance** 20:*4*
**DISTRICT** 1:*1*
**Docs** 55:*20, 22*
**document** 22:*12, 16,*
*24* 31:*19* 32:*12*
33:*11* 37:*20* 38:*12,*
*15, 23* 39:*11, 14* 49:*4,*
*6, 7*
**documents** 30:*23*
31:*24* 33:*2* 42:*7, 14*
48:*12, 18, 20* 49:*22*
51:*6* 53:*10, 15, 21, 22*
59:*7*
**doing** 6:*11* 7:*10, 14*
8:*7, 16* 10:*25* 13:*22*
53:*21*
**dollar** 40:*19*
**Dolphins** 6:*21*
**doors** 7:*19*
**draft** 39:*25*
**drafted** 31:*20*
**drafts** 39:*24*
**dragged** 47:*24*
**drain** 35:*16* 36:*21*
**drainage** 34:*9*
**Drive** 5:*1* 36:*11*
62:*4*
**drywall** 34:*9, 25*
**dual** 9:*6*
**duly** 3:*3*
**DUNN** 2:*1*

**< E >**
**earlier** 24:*14* 25:*21*
34:*17* 40:*7* 44:*4, 24*
58:*24* 61:*3* 62:*7*
**early** 19:*25* 21:*11*
**earnest** 16:*24* 17:*9*
21:*21* 40:*18*
**East** 13:*24, 25* 14:*5*
17:*7* 23:*23* 24:*1*
40:*13* 41:*19* 57:*11*
63:*4, 15*
**EASTERN** 1:*1*
**education** 6:*5, 7, 17*
**educational** 6:*3*
**educator** 11:*7*

**effort** 19:*11*
**eight** 31:*16* 44:*18*
**either** 10:*6*
**electronic** 39:*5*
**Elm** 5:*9, 10, 16* 15:*1, 12, 14* 18:*19* 19:*5, 14* 24:*22* 28:*2* 36:*12, 18* 50:*13* 51:*8, 12*
**email** 17:*19, 24* 18:*7* 21:*19* 24:*18, 23* 25:*1* 28:*21, 23* 29:*2, 3* 51:*8* 54:*23* 55:*7, 17, 24* 56:*3, 4, 24, 25* 57:*3*
**e-mail** 24:*15*
**Emails** 2:*1* 22:*5, 10* 42:*19* 51:*8* 58:*2*
**employee** 64:*12, 13*
**ended** 12:*5, 14*
**ends** 55:*21*
**enters** 36:*21*
**entire** 45:*23*
**especially** 3:*22*
**estate** 8:*3, 15* 18:*23* 21:*2, 3, 8* 26:*22* 30:*10* 32:*25* 35:*19* 61:*18*
**estimate** 62:*8*
**estimated** 25:*18, 19*
**estimation** 45:*16*
**EVAN** 2:*1* 26:*20* 32:*21* 38:*19*
**event** 34:*19*
**everybody's** 60:*2*
**evidence** 49:*9*
**evident** 49:*19*
**exact** 10:*5* 30:*7*
**exactly** 12:*24* 55:*16*
**Examination** 1:*1* 2:*1* 3:*5*
**examined** 3:*4*
**example** 13:*23*
**exchange** 62:*11*
**excuse** 5:*22* 13:*1* 37:*7*
**executed** 22:*1* 31:*12*
**Exhibit** 2:*1* 22:*17, 19* 30:*19, 22* 33:*15* 37:*12, 17, 24, 25*

54:*20* 58:*5, 8* 59:*6* 62:*25* 63:*2*
**EXHIBITS** 2:*1*
**expand** 44:*17*
**expect** 50:*22*
**expectation** 51:*2*
**expected** 53:*25*
**experience** 18:*24*
**expires** 64:*22*
**explain** 5:*15* 7:*10* 15:*7* 23:*25* 49:*8* 50:*3* 62:*17*
**explained** 16:*6*
**expressly** 24:*6*
**extend** 45:*25*
**extended** 48:*14* 49:*10* 50:*5* 54:*3*
**extending** 48:*23* 53:*17*
**extensive** 19:*4* 20:*3*
**extent** 23:*16* 31:*12* 43:*17*

**< F >**
**facade** 52:*1*
**fact** 23:*19* 27:*21* 37:*24* 41:*13, 15* 45:*6* 47:*18* 54:*12* 59:*19*
**failings** 48:*9*
**fair** 4:*3, 4* 47:*2* 54:*3* 55:*11*
**fall** 56:*8*
**familiar** 18:*19* 22:*16, 24* 26:*25* 27:*25* 33:*3*
**family** 5:*18* 11:*9* 29:*19* 58:*18*
**far** 32:*3* 53:*16*
**fast** 16:*13* 56:*20*
**February** 17:*25* 20:*1* 21:*12* 24:*23* 28:*22* 44:*19* 45:*7* 46:*12, 21, 23* 47:*8* 48:*9* 54:*23* 55:*10* 62:*11*
**Federal** 1:*1*
**feel** 4:*6* 30:*5* 37:*10* 48:*6*
**feeling** 52:*25*
**felt** 18:*16* 20:*15* 52:*6* 61:*15*

**field** 11:*5*
**figure** 32:*25* 57:*3*
**filed** 11:*20* 23:*3* 57:*7, 14* 63:*4, 11*
**final** 54:*8*
**financed** 10:*6*
**financially** 64:*14*
**financing** 16:*22* 17:*7*
**find** 28:*6* 55:*17*
**fine** 12:*25*
**finish** 37:*9* 52:*16*
**finished** 34:*10* 54:*14* 55:*2*
**fire** 6:*14*
**Firm** 14:*23* 32:*20*
**first** 3:*3* 11:*22* 12:*21* 17:*19* 25:*14* 29:*12, 18* 31:*16* 41:*7* 43:*14* 51:*16* 55:*4* 57:*1* 60:*5* 62:*12*
**five** 31:*3*
**fixed** 20:*20*
**fixing** 28:*18*
**flexmls.com** 55:*11*
**flip** 11:*24* 23:*23* 24:*2* 26:*21, 24* 27:*6* 28:*24* 29:*14* 30:*14* 33:*23* 42:*2, 11, 16* 46:*2, 17* 58:*16*
**flipped** 10:*7*
**flipping** 9:*1, 3* 10:*15* 41:*24*
**flips** 8:*8* 9:*14* 10:*10* 37:*2*
**flood** 35:*12, 14, 22* 36:*3* 45:*3*
**flooded** 34:*8*
**flooding** 34:*14, 19*
**Florida** 6:*23* 9:*25* 10:*1*
**floundered** 47:*21*
**focused** 8:*6*
**folds** 8:*14*
**follow** 19:*24*
**followed** 24:*14* 29:*2*
**following** 21:*22* 29:*10*
**follows** 3:*4*
**foot** 19:*3*

**foreclosure** 21:*1* 57:*11*
**form** 26:*8, 20, 22*
**forthcoming** 61:*7*
**forward** 52:*13* 56:*20* 58:*20*
**found** 41:*13*
**foundation** 20:*16* 44:*25*
**Four** 13:*19, 20, 21* 31:*3*
**fraudulent** 49:*12*
**fraudulently** 45:*25* 48:*14, 22* 49:*10* 50:*5* 53:*16* 54:*2*
**free** 4:*6*
**freezing** 35:*5*
**French** 30:*4*
**friend** 7:*18* 8:*13* 19:*19* 32:*5*
**friends** 8:*22* 19:*13*
**front** 29:*4*
**frozen** 35:*9*
**fucking** 30:*8*
**fulfill** 49:*25*
**full** 3:*7* 55:*1*
**fund** 23:*10*
**funding** 44:*7*
**funds** 10:*2*
**furnish** 39:*19*
**further** 37:*8* 63:*18* 64:*11*

**< G >**
**game** 35:*7*
**gauged** 18:*12*
**general** 8:*19* 48:*2*
**gentleman** 12:*1*
**get-go** 45:*13* 61:*15*
**getting** 11:*5* 56:*22* 59:*2*
**give** 4:*14* 13:*14* 16:*6* 48:*3*
**given** 15:*10* 52:*6* 58:*14*
**go** 3:*13* 6:*15* 11:*13* 13:*17* 22:*24* 25:*25* 26:*9* 27:*8* 33:*15* 38:*21* 45:*20* 49:*1*

55:*10* 61:*19*
**goal** 9:*9*, *14*
**goes** 11:*14*, *16*, *17*
36:*21*
**going** 3:*19* 4:*1*, *2*, *9*
14:22 24:7 27:7
28:*21*, *24* 30:21 31:6
32:16 33:*15*, 21 36:2,
*14*, *15* 40:2 42:5
45:*3* 51:*16* 53:*11*, *14*
58:4 62:2, *14* 63:6,
*10*
**gold** 19:*15*
**good** 9:*19* 12:22
15:5, *14* 16:*3* 18:*13*
35:7 40:*21* 48:2
50:*12* 60:2 62:*15*
**grant** 6:*25*
**gray** 59:*11*, *19*
**ground** 3:*25*
**Grove** 5:*9*, *10*, *16*
15:*1*, *12*, *14* 18:*19*
19:6, *14* 24:22 28:2
36:*12*, *18* 50:*13* 51:*9*,
*12*
**guess** 21:*23* 35:*1*
59:*25* 60:*12*
**guest** 30:*13*
**guidelines** 60:2
**gutted** 19:*8*
**guys** 7:*4*

**< H >**
**H&L** 16:*17*
**half** 55:*1*
**hand** 64:*17*
**handled** 51:2
**handshake** 32:7
**happened** 41:6 48:*9*
**happens** 35:*14*, *18*
36:*23* 39:*23*
**happy** 58:*18*
**hard** 3:*24* 13:*11*
15:*20* 16:*16* 40:*11*
51:*18*
**hashing** 53:7
**head** 3:*16*, *17* 10:*13*
22:7
**hear** 35:6, *10*
**hearing** 4:*14*

**held** 9:*11* 10:7, *8*
58:7
**hello** 54:*24*
**help** 12:*11* 48:2
**helping** 13:*3*
**hereunder** 64:*16*
**hey** 56:*12*
**High** 6:*24* 7:*4*
**hindsight** 47:*15*
**history** 6:6
**hold** 60:*25*
**holding** 8:*8*, *15* 10:*16*
**home** 12:*1* 15:*21*
17:*5* 19:*5*, 6 20:*11*
25:*18* 26:*3* 27:*19*
28:*11*, *14*, *17*, *18*
36:*11*, *24* 43:6 44:*14*
46:*17* 50:*16*, *20*, *24*
51:*4*, *5*, *24* 58:*14*, *19*
**homes** 11:*25* 15:*15*
19:*17* 20:*11*
**honest** 8:*5* 22:*3*
**hoping** 61:*21*
**horse** 61:*22*
**house** 20:*13* 27:22
28:*4* 30:*10* 44:*10*, *11*
46:*17* 49:*14* 50:8
58:*16*, *18*, *25* 62:*15*,
*16*, *19*
**houses** 10:*1*
**housing** 9:*17*
**HRL** 16:*17*
**human** 36:*4*

**< I >**
**ID** 2:*1*
**idea** 16:*10* 49:*18*
55:*22*
**ideally** 29:*9* 45:*16*
**identify** 30:*23* 42:7
48:*12*, *21*
**illustrate** 42:*15*
**important** 3:*13*, 22
**improper** 34:*9*
**improved** 25:22 27:2
**improvements** 13:*4*
25:*14*
**inaccurate** 47:*3*
**inches** 62:*14*
**including** 55:*3*

**independent** 8:*14*
32:*3*, *18*
**independently** 13:7
**indicate** 46:*3* 50:*4*
**indirectly** 64:*15*
**individual** 11:*21*
**individually** 13:7, *22*
**inevitable** 36:*21*
**information** 52:22
**initial** 24:*3* 27:*4*, *5*
47:*23* 53:*1*
**Initially** 29:*8* 58:*4*
**initials** 16:*17*
**initiated** 57:*10*
**insert** 24:*21*
**inserted** 55:7, *18*
**inside** 20:7
**inspect** 20:*18*
**inspector** 6:*13*, *14*
11:7
**instance** 1:*1*
**instructed** 4:*16*
**instrument** 31:*20*
**intend** 47:*1*
**intended** 40:*3* 46:*1*,
*3*, 6 47:*10*, *15* 48:*21*
60:*16*
**intending** 29:*15*
**intent** 46:*14*
**intention** 41:*24*
**interest** 17:22, *23*
**interested** 64:*14*
**interject** 4:*11*
**Interrogatories** 2:*1*
**Interrogatory** 42:*4*, 6
48:*11* 49:*5*, 22 53:*14*
**investigate** 18:*20*
**investigation** 18:*23*
20:*4*
**investment** 13:*9*, *14*
26:22 28:*14* 29:7
42:*17* 43:5 46:*15*
**investments** 30:*11*
47:*23*
**involved** 48:*8*
**issue** 34:*18* 60:*1*
**issues** 20:*16* 34:*5*
40:*3* 44:*25*
**item** 25:*13*

**independent** *(cont.)*

**< J >**
**Jackson** 2:*1*
**January** 32:*21* 57:7,
22
**Jefferson** 2:*1*
**JESUS** 1:*1* 3:*2*, *9*
64:*8*
**job** 20:*13*
**jobs** 8:*16*
**Joe** 8:*22*
**July** 5:*4*
**jump** 30:*21*
**jumped** 6:*16*
**June** 33:22 57:*23*

**< K >**
**keep** 11:7 58:*3*
**keeping** 58:*18*
**keeps** 58:*25*
**kept** 52:*14*
**KERKMAN** 2:*1*
**kids** 11:*10*
**kind** 6:*16* 7:*14* 9:6
11:*4* 12:*9*, *12*, *17*
17:*21* 19:*13* 28:6, *15*
29:*3*, *23* 50:*9* 51:*19*
53:*11*, *21* 56:22
**kitchen** 20:*9*
**kitchens** 7:*18*
**knew** 15:*17* 32:*4*, *11*
34:*16*
**KNIGHT** 1:*1* 11:*23*,
*24* 13:*17*, *23* 24:*1*, *15*
25:*2*, *21* 26:*16* 27:*1*,
*25* 28:*24* 29:*13*
30:*15* 41:*2*, *15* 43:*20*
44:*13* 45:*13* 46:*13*,
*20* 47:*8* 51:*9*, *13*
52:*3*, *4* 54:*24* 57:*11*
58:*12* 59:*24* 60:*8*, *15*
62:*8*, *13*, *19*
**Knight's** 11:*20*
**know** 9:*12*, *13* 10:*11*
12:*18* 14:*11* 18:*9*, *25*
20:*3*, 7, *8*, *9*, *11*, *20*
22:6 26:*14* 28:*10*, *15*
30:*8* 32:7, *19*, *22*
35:*13*, *21* 36:*1*, *14*
39:*17* 40:*12* 41:*1*, *2*,

5, 7 44:25 45:3, 18, 19 49:17 52:3 53:7 55:21, 25 57:2 61:25 62:18, 21
known 16:9 42:9
knows 32:6
Kuttemperoor 31:22 32:1

< L >
laborer 7:13
ladder 52:1
late 49:20
Laughter 7:8
law 7:3, 6 14:23
lawsuit 57:17, 22, 23
lawsuits 57:13
leads 3:17
learn 29:13
learned 41:15 43:20
learning 34:14
led 56:15
left 29:24
legal 32:12 49:7
lender 16:16
letter 8:23
liability 8:18 16:8
licensed 7:12 8:20
lifestyle 42:19, 23 44:8
liked 16:10
liking 15:14
limited 8:18 16:7
line 9:23 22:6 23:21 25:13 34:12 52:16
lined 22:8
link 55:12, 16
Liquin 32:5
list 15:22 18:7 24:4, 7 42:2 43:8 45:16 56:19 58:14, 17
listed 24:12 61:23
listen 62:1
listing 9:9 12:2 29:9 50:2 61:16
litigation 33:1 57:13, 21
little 4:20 6:15 7:7 12:9 16:13 30:21

51:20
live 4:21 5:8 11:9
lived 5:3, 9, 21 6:22 15:15 27:15, 17 28:19
lives 19:19
Living 28:4, 5 49:13
LLC 63:5
loan 9:25 13:11 15:20 16:23 17:3, 11 23:10, 12 33:5, 9 40:7, 11 42:11, 13, 17 46:1, 4, 6 47:2 48:14, 23 49:10 50:5 53:17 54:3
loans 9:24 59:21
located 15:1
Lone 14:17, 24 15:1, 4 16:14 17:15 18:20 19:24 23:11, 13 24:2 25:3, 23 28:9 33:16, 18 34:5, 15, 21 41:3, 16, 20 44:3 46:7, 14, 24 47:9 48:4 51:13 55:12, 20 60:22 61:5 62:20 63:16
long 5:3, 10 30:17 59:2 62:16
look 10:12 22:16 37:14 38:12 49:24 51:6 54:25 55:20 59:13
looked 20:5
looking 10:12 18:25 19:1 58:1
looks 31:21 51:9, 18, 22 53:6, 7, 10 56:1 58:11
lose 55:4
lot 18:17, 22 19:16, 17, 20, 22 32:8
lots 52:7 55:2
loud 61:12
love 19:23
lower 58:12
lucrative 9:8

< M >
M&M 8:11 10:18,

22 14:1, 5
Maggie 11:13, 15, 16
maintenance 36:25
major 20:22
making 14:16 40:13 44:8
MALLERY 2:1 14:7, 23 32:1, 17
man 19:22
manage 7:25 13:12, 13 21:9 37:1 52:8, 9
management 7:15 8:11 10:23 13:24 14:1, 2, 5, 6 17:8 40:13 41:20 57:12 63:5, 15
manager 11:1 12:15
managing 9:5 13:6 37:5, 10
March 1:1 64:9, 18
Margaret 11:12, 13, 16
MARKED 2:1 22:19 30:19, 22 37:12 54:20 58:8 62:25
market 9:13 15:17 18:13 21:7 30:12, 13 43:8
marketability 24:13
markets 19:15
MARKOS 1:1 3:2, 9 26:1, 10 27:7 33:2 38:2 64:8
Marquette 6:4, 18, 24 7:1, 3, 4, 5
Mary 11:12
Massachusetts 6:8
master's 6:7
matter 30:9 59:5
mean 5:17 14:25 16:22 29:17 34:22 41:4 42:22 44:11 45:7 49:12, 24 50:8, 9 55:25 61:14
means 25:17 29:14
meet 11:23 12:21 26:4 28:12 60:2
Meg 11:14, 17
mentioned 21:20

27:16 41:12 49:19
mentioning 56:16
mess 51:19
message 56:24 58:13 59:15 60:12 62:6, 11, 13
Messages 2:1 56:12 58:10 59:9
met 11:24 12:4 26:3 28:12 30:1 56:5
Miami 6:20
Microsoft 11:2
Milwaukee 2:1 6:13 7:23 12:7 64:2, 18
mindset 15:13
Mine 10:21 15:10
minors 6:6
mischaracterization 25:25
mischaracterize 26:6
misspoke 44:12
mistake 47:12
mitigate 36:16, 19
mitigated 35:18
money 13:11 15:20 16:5, 16, 24 17:3, 6, 9 18:9 21:21 29:8 30:17 40:11, 18 43:13 46:18 47:4, 25 55:4
month 60:18
monthly 52:11 56:10
months 17:1 31:16 40:8 44:18 52:18 59:20 62:9
Mortgage 2:1 22:1, 2 31:2, 4, 6, 8, 14 33:12 40:8, 20 43:15 44:8 49:1, 2 58:20
move 49:16 50:21 58:20
moved 5:7, 13 19:11 27:19 44:10, 11, 13 49:15, 17 50:8
moving 5:8 24:10 35:6 41:11 52:13 59:6 62:13
mud 47:25

**multiple** 37:2 47:24
**mystery** 36:23

**< N >**
**name** 3:8 8:10
10:17, 19, 21 11:11
14:2
**names** 8:24
**native** 6:19
**nature** 8:1
**need** 3:19 10:5
58:21
**needed** 9:14 20:6
21:5, 21 40:22 48:4
52:15
**needs** 34:11
**neighborhood** 18:14
19:2 50:17
**neither** 24:1
**never** 24:11 41:10
42:13 44:14 46:1, 3,
6, 14, 17 47:3 49:14
**new** 62:16, 18
**nice** 16:7 19:10, 19
20:13 28:18
**Nicholas** 8:22, 24
**night** 18:1
**nodding** 3:17
**nods** 3:16
**normal** 50:22 53:2,
12
**normalized** 9:20
**North** 2:1 5:1
**Nos** 37:12
**Notary** 1:1 64:6, 21
**Note** 2:1 17:15 22:2
31:4, 7, 13 33:6, 12
42:20 49:2
**noted** 34:4
**notes** 18:1
**Notice** 1:1
**November** 41:17
43:22 58:11, 21
59:14, 16 60:14
**number** 10:5 18:24
**numbers** 17:23 29:3

**< O >**
**oath** 3:4

**objection** 4:12 25:24
26:8, 19
**objections** 4:13 39:4
**obtain** 29:15 45:25
**obtained** 17:14
33:23 48:14 49:10
50:5 54:2 63:15
**obtaining** 48:23
53:17
**obviously** 35:11
**occupancy** 50:20
**occupied** 5:18 25:23
27:3 41:3 43:20, 24
50:14, 19
**occupy** 23:23 24:2, 8
25:3 50:24
**occupying** 26:17
28:8 41:15 43:25
44:6, 20 54:13
**occur** 35:2 45:8
61:23
**occurred** 44:22
**occurring** 34:20
**October** 5:6 31:7, 8,
14 36:2 41:17 43:18,
21 45:8 52:19 60:19
**odd** 50:9
**offer** 43:9 46:24
47:8
**offered** 48:1, 3
**office** 64:17
**Oh** 28:5 57:19
**Okay** 4:9, 18 6:15,
17 8:9 9:22 10:24
12:20, 25 13:16
14:24 15:7 16:12
17:6 18:15 21:25
22:4, 13, 15 23:4, 16
25:16 28:8 29:12
30:21 31:9, 23 33:5,
12 35:1 36:6, 9 37:6
38:16, 20 39:2, 23
40:12 43:2, 4 49:8
55:15 57:3 58:1
59:4, 17 60:8 61:3
**old** 7:13 39:25
62:15
**ones** 12:16
**one-year** 44:16

**online** 18:24
**open** 37:3
**operating** 35:17
**operational** 36:19
**opportunities** 13:9
**opportunity** 4:9
15:8, 12, 18 17:18
18:20 20:2
**order** 42:12 50:23
**original** 19:7
**originally** 6:20
**outline** 6:16
**outlines** 24:18
**outside** 20:7
**owned** 19:6 20:11
**owner's** 19:7

**< P >**
**p.m** 1:1 63:21
**Pack** 6:21
**PAGE** 2:1 31:2, 19
54:22 55:17 59:13
61:3 62:11 63:6
**pages** 22:23 31:3
**paid** 19:16 40:25
46:17 47:3 54:9, 12
59:2
**paragraph** 33:21
42:8 48:15, 21
**pardon** 30:4
**part** 24:11 25:4
28:1 37:20 44:14
**particular** 10:22
53:23
**parties** 64:13
**partners** 7:17 8:16,
17
**patience** 52:7
**patient** 45:22
**Paul** 8:22
**pay** 42:18, 22 47:1,
21 56:18
**paying** 17:8 44:6
47:5
**payment** 23:10, 13,
17, 18
**payments** 16:25
40:9, 10, 12, 14, 19
44:8

**people** 11:7 19:23
51:1
**Peoria** 5:2
**percent** 13:10 14:12
15:19
**perfect** 45:20
**perform** 16:8 18:18
62:4
**period** 5:21 9:12
12:19 43:17 44:16
61:5
**person** 30:2 37:10
**personal** 9:23 14:2
19:5 26:2 27:19
28:11, 17 30:11
36:11 42:12, 17, 18,
23 43:6 44:1, 5, 7, 14
50:16 64:10
**personally** 10:15
30:15
**pertains** 39:8
**pertinent** 35:24
**phase** 35:5 53:9
**phone** 17:19, 21
18:6 24:7, 16 52:10,
11
**phonetic** 32:5 40:10
**photos** 20:5 52:5, 22
53:4, 24
**pics** 51:9, 12
**picture** 51:17, 25
**pictures** 51:13 52:12
**place** 36:16
**placement** 13:13
**Plaintiff** 1:1 2:1
42:10, 13 48:15, 24
53:17
**Plaintiff]'s** 42:11
**Plaintiff's** 2:1 38:6
42:8 48:13
**plan** 13:15 24:4
58:16
**planet** 36:4
**planned** 49:13
**play** 17:20
**playing** 35:7
**please** 3:7 27:10
**plus** 16:2
**point** 9:21 23:8
24:8 28:11 29:23, 25

31:6 32:*14*, *18* 34:7 40:*21*, *22* 50:*12* 56:*6*, *21* 61:*25*
**points** 24:*18* 28:*23*
**political** 6:*6*
**pool** 20:7
**portion** 43:*16* 58:*12*
**possible** 43:*9*
**potentially** 18:*9*
**practice** 32:*14*
**practicing** 9:*16*
**predates** 59:*16*
**preface** 56:*14*
**prepare** 18:2 31:*23* 53:*9*
**prepared** 33:*16* 34:*1*
**presented** 15:*8*, *18*, *23* 17:*18* 18:*4* 29:*19* 40:*17* 42:*15*
**presenting** 20:*1*
**preserve** 4:*13*
**pressed** 52:*25*
**pressing** 52:*14*, *21*
**presumably** 27:*22* 44:*6*
**presume** 59:*15*
**pretty** 9:*20* 14:*4* 18:*2*, *13*, *16* 32:*13* 36:*17*
**previously** 26:*16* 27:*1* 28:*1* 46:*19*
**price** 16:*19* 18:*8* 19:*3* 21:*9* 25:*14* 45:*12*
**primary** 50:*16*
**principal** 63:*14*
**prior** 25:*23*, *25* 26:*7* 28:*9* 35:*3* 43:*24* 46:*20*, *23*, *24*
**priorities** 36:*15*
**priority** 37:*4*
**probably** 22:*5*
**problem** 58:*17*
**problems** 38:*16*
**Procedure** 1:*1* 53:*2*
**proceeding** 11:*20* 15:*2*, *4*
**PROCEEDINGS** 3:*1* 63:*21*
**proceeds** 23:*13*, *18*

**process** 3:*14* 53:*3* 54:*6*
**produced** 39:*9* 49:*21* 51:*7* 59:*8*
**production** 22:*12* 52:*7*
**Professional** 1:*1* 64:*6*
**profit** 43:*11* 55:*3*
**progress** 52:*15*
**project** 12:*12* 15:*25* 37:*1*, *5* 40:*23* 50:*7*, *9* 51:*3* 53:*3* 54:*10* 61:*9*, *16*, *18*, *22* 62:*9*
**projects** 45:*19* 62:*3*
**Proof** 2:*1* 63:*3*
**properties** 7:*22*, *23* 8:*8* 9:*1*, *3*, *7*, *8* 10:*3*, *4*, *8*, *9*, *14* 12:*15* 13:*4*, *6*, *16* 60:*23*
**property** 5:*12*, *16* 8:*11* 10:*22* 12:*5*, *6*, *15* 14:*2*, *6*, *18*, *24* 15:*1*, *5* 16:*14* 18:*21* 19:*1*, *25* 20:*24* 21:*16* 23:*11*, *24* 24:*2*, *8* 25:*3*, *22* 26:*16*, *21*, *24* 27:*2*, *17* 28:*2*, *8*, *25* 29:*7*, *8*, *14*, *16*, *22* 30:*6* 33:*16*, *18*, *20*, *24* 34:*6*, *15*, *21* 35:*19*, *21* 36:*2* 41:*3*, *10*, *11*, *16*, *21*, *25* 42:*2*, *11*, *16* 43:*5*, *7*, *21*, *25* 44:*3*, *13*, *21* 45:*1*, *3* 46:*2*, *14* 47:*9* 50:*1*, *13* 52:*1* 53:*8* 54:*1*, *13* 55:*12* 57:*16* 59:*5* 62:*20* 63:*16*
**prove** 59:*25*
**provide** 4:*24* 22:*11*, *18* 39:*24*
**provided** 16:*13*, *18* 17:*7* 37:*15* 38:*7*, *9*, *13* 39:*14* 40:*8* 42:*15* 43:*14* 48:*18*, *20* 49:*23*
**providing** 17:*2* 51:*14* 52:*4*
**Public** 1:*1* 64:*6*, *21*

**pull** 14:*4* 21:*20* 22:*5* 59:*21*
**pump** 34:*9*
**pumped** 36:*22*
**pumps** 35:*17* 36:*19*
**purchase** 9:*15* 15:*21* 16:*14*, *19*, *25* 17:*4*, *9* 21:*16* 25:*14* 34:*20* 41:*10* 42:*11* 43:*7* 45:*7*
**purchased** 5:*12*, *16* 7:*24* 9:*9* 10:*6* 12:*1* 15:*15* 19:*6* 24:*22* 25:*13*, *22* 27:*2*, *17*, *23* 45:*1*, *4* 50:*12*
**purchases** 59:*5*
**purchasing** 7:*22* 9:*4*, *7* 10:*15* 12:*16*, *17* 13:*4*, *7* 26:*16* 28:*1* 45:*12*
**purpose** 33:*8* 50:*15*
**purposes** 33:*10*
**pursuant** 1:*1*
**push** 62:*3*
**put** 13:*10* 14:*12* 15:*19*, *24* 16:*5* 19:*9*, *11* 29:*3* 40:*17*
**putting** 16:*24*

< Q >
**question** 3:*19* 4:2, *6*, *10*, *17*, *18* 12:*22* 26:*9*, *12*, *20* 27:*5*, *10* 30:*5* 35:*1* 38:*11* 42:*25* 59:*21* 60:*6* 62:*6*
**questions** 4:*1* 63:*18*
**quick** 21:*22*
**quickly** 21:*6* 43:*8*
**quirky** 28:*16*

< R >
**RAMIREZ** 1:*1* 3:*2*, *7*, *9*, *10* 8:*24* 11:*12* 23:*9*, *22* 26:*6*, *25* 33:*23* 37:*23* 38:*5*, *23* 39:*15*, *19* 42:*21* 43:*1* 46:*1*, *5* 49:*3* 50:*6* 59:*13* 62:*18* 63:*3* 64:*8*

**ranks** 7:*14*
**rate** 31:*13*
**rates** 9:*19*
**reach** 32:*17* 40:*19* 45:*21* 57:*4*
**reached** 14:*21* 32:*10*, *13*, *16*
**read** 25:*13* 60:*5*, *7* 61:*10*, *12*
**ready** 56:*12* 61:*18*, *22*
**real** 8:*3*, *15* 18:*23* 26:*22* 30:*10* 32:*25* 61:*17*
**reality** 59:*23*
**really** 11:*6* 12:*22* 16:*3* 19:*14* 20:*5*, *13* 21:*5* 28:*18* 30:*16* 45:*13* 48:*1* 51:*22* 52:*12*, *25* 53:*23* 54:*1* 58:*25* 60:*21* 61:*8*
**reason** 16:*4* 19:*22* 61:*15*
**rebuffed** 48:*5*
**rebuilt** 34:*11*
**recall** 14:*6* 21:*1*, *14* 22:*1*, *3*, *7* 30:*1* 34:*14*, *20* 41:*14* 57:*15*, *21*, *25* 58:*6* 62:*23*
**receive** 16:*1* 41:*9*
**received** 14:*13* 37:*16*, *22* 40:*4*
**receiving** 13:*11*
**record** 3:*8* 4:*12* 58:*7*
**recorded** 64:*8*
**records** 10:*12*
**reduced** 64:*9*
**reference** 21:*19* 27:*5* 60:*22*, *23*
**referenced** 24:*14* 32:*12* 34:*17* 40:*20* 44:*4*
**referencing** 24:*24*
**referred** 32:*4*
**referring** 62:*19*
**refi** 56:*17* 59:*20* 60:*16*, *25*
**refinance** 29:*15* 30:*15*

**refinancing** 60:*1*, *9*
**refuse** 51:*23*
**regard** 22:*9*
**regarding** 48:*22*
**Registered** 1:*1* 10:*20* 64:*5*
**rehab** 7:*24* 9:*15* 15:*21* 17:*5* 18:*8* 36:*13*, *25* 50:*18*
**rehabbed** 5:*13*, *17* 10:*7*
**rehabbing** 7:*22* 9:*4*
**rehabilitate** 42:*2* 43:*8*
**rehabilitated** 50:*13*
**rehabilitating** 50:*1*
**related** 22:*10* 33:*3*, *5*
**relates** 38:*9*
**relation** 24:*10*
**relationship** 12:*8*, *13* 56:*7*
**Relative** 19:*24* 64:*12*, *13*
**Relatively** 21:*18*, *22*
**relevant** 53:*15*
**remember** 7:*6* 9:*16*, *18* 12:*24* 14:*3* 16:*17* 20:*23* 21:*4*, *19* 28:*17* 36:*17* 54:*25*
**remodeling** 7:*18*, *20* 20:*8*
**removed** 19:*8*
**renovations** 41:*20*, *23*
**rental** 7:*23* 8:*8*
**repaid** 24:*5* 43:*10* 46:*8*, *10* 47:*19*
**repair** 16:*20*, *22*
**repaired** 27:*17*
**repairing** 26:*17* 28:*2* 50:*24*
**repairs** 7:*25* 54:*13*
**repay** 46:*3*, *6*, *15* 47:*10*, *16*
**repeat** 27:*9* 53:*19*
**replies** 56:*23*
**Reporter** 1:*1* 64:*6*
**represent** 23:*2* 24:*1* 59:*12* 63:*3*
**represented** 23:*9*, *17*, *22* 25:*7*

**represents** 25:*2* 63:*14*
**request** 48:*17*
**requesting** 52:*10*, *11*
**REQUESTS** 2:*1*
**resale** 18:*11* 25:*8*, *11*
**research** 19:*4*
**resided** 5:*10*
**residence** 5:*6* 42:*12* 44:*1*, *5*
**residential** 7:*20* 23:*11*
**resolved** 58:*21*
**respond** 53:*23*
**responded** 57:*2*
**response** 3:*20* 30:*7* 42:*4*, *14*, *22* 48:*17*, *19* 53:*16*, *20* 59:*18* 62:*16*
**Responses** 2:*1* 37:*14*, *15*, *19*, *25* 38:*7*, *10* 39:*2*, *8*, *21* 40:*4*
**responsibility** 37:*11* 40:*25*
**responsible** 36:*5*
**responsive** 49:*4*, *22*
**result** 54:*8*
**retrospect** 48:*6*
**return** 13:*14* 14:*14*, *15* 16:*7* 19:*10*
**returned** 47:*23*
**review** 23:*6* 48:*18* 49:*1* 53:*20* 56:*23*
**right** 3:*10*, *13*, *15* 4:*7*, *20*, *24* 5:*3*, *21* 9:*17* 15:*5*, *9* 16:*5* 25:*6* 28:*12* 31:*19* 33:*21* 34:*2*, *4*, *22* 36:*24* 37:*14* 38:*5*, *21* 39:*17* 43:*13* 44:*3*, *16* 46:*21* 47:*14* 53:*21* 54:*8* 57:*10* 59:*2*, *12* 60:*3*, *10* 63:*5*
**road** 29:*20*
**ROBINSON** 2:*1* 4:*11* 22:*11* 25:*24* 26:*8*, *19* 27:*4* 32:*20* 38:*2*, *18* 39:*13* 42:*25* 43:*3* 57:*6* 63:*20*

**Robinson's** 22:*25*
**roof** 19:*8*
**roofs** 7:*19*
**room** 18:*17*
**root** 6:*21*
**Rules** 1:*1* 3:*25*
**run** 40:*2* 62:*2*
**running** 38:*16*

**< S >**
**S.C** 2:*1*
**safe** 11:*8* 18:*16* 56:*6*
**safety** 11:*1*
**sale** 9:*10* 12:*5* 15:*22* 19:*3* 20:*14* 21:*2*, *9*, *14* 24:*4*, *7*, *12* 30:*14* 35:*20* 42:*3* 50:*2* 58:*14*
**Savik** 40:*10*
**saw** 56:*25* 57:*17*
**saying** 4:*5* 9:*3* 24:*6* 25:*16* 27:*7* 34:*1* 43:*19*, *22* 47:*14* 56:*5*, *24* 58:*11* 60:*8* 61:*7*, *8*
**says** 25:*11* 31:*2*, *20* 34:*22* 39:*2*, *4* 51:*12*
**schedule** 29:*25*
**SCHMIT** 2:*1* 3:*6* 22:*15*, *20* 26:*5*, *13*, *23* 27:*11*, *13* 30:*20* 32:*23* 37:*13* 38:*4*, *20*, *22* 39:*16* 43:*12* 54:*21* 58:*1*, *9* 63:*1*, *18*
**scholarship** 6:*25* 7:*2*
**school** 6:*9*, *25* 7:*3*, *5*, *6*
**science** 6:*6*
**screen** 22:*21* 38:*19* 48:*11*
**scroll** 22:*23* 24:*20* 33:*21* 42:*5* 63:*6*, *10*
**scrolling** 54:*22*
**seal** 64:*17*
**second** 11:*17* 51:*25*
**secondary** 6:*5*
**See** 5:*25* 17:*21*, *23* 21:*25* 22:*21*, *25* 25:*7*, *11* 29:*23* 31:*10*

**34**:*12* 38:*15*, *17*, *23* 39:*3* 42:*19* 53:*3*, *22* 55:*10* 60:*3*
**self-employed** 6:*11* 7:*9*
**sell** 9:*15* 25:*18*, *19* 29:*7* 61:*20*
**selling** 9:*5*, *6* 28:*3*, *25*
**sells** 29:*8*
**sending** 59:*10*
**sense** 6:*1* 16:*4*, *9* 32:*24* 58:*23*
**sent** 17:*24* 18:*7* 56:*11*, *24*
**September** 35:*22* 62:*12* 64:*22*
**services** 47:*5*
**set** 64:*17*
**settled** 57:*20*
**seven** 10:*9*, *10*, *13*
**SF** 55:*1*
**sharing** 38:*18*
**SHERYL** 1:*1* 22:*18* 58:*3* 64:*5*
**shifted** 12:*9*
**Shorewood** 19:*18*, *19*, *20*, *21*
**short** 21:*2*
**shortly** 55:*6* 60:*1*
**short-term** 42:*16*
**show** 25:*10* 30:*22* 46:*9*, *16*
**showed** 18:*7* 25:*8*
**showing** 38:*6* 53:*15*, *25*
**shows** 49:*25* 50:*7* 51:*4*
**sic** 54:*23*
**signature** 22:*25* 38:*13*, *14*, *25* 39:*1*, *5*, *25* 63:*7*
**signed** 14:*17* 31:*8*
**significant** 19:*9*
**simple** 14:*11* 17:*24*
**sir** 5:*24* 6:*2* 45:*15* 54:*19* 59:*3*
**sites** 11:*2*
**sitting** 35:*7*
**situation** 52:*10*

**six** 6:*12* 17:*1* 40:*8* 58:*6* 59:*20*
**six-month** 43:*17* 45:*12*
**sodas** 19:*20*
**sold** 15:*16* 16:*1* 20:*24, 25* 27:*22* 28:*5* 30:*12*
**solely** 33:*9*
**somebody** 30:*12*
**son** 19:*7*
**sorry** 10:*14* 26:*6* 36:*7* 53:*19* 58:*2*
**sort** 18:*20* 20:*22*
**sounded** 20:*6*
**sounds** 57:*9*
**south** 28:*7* 32:*16* 57:*16*
**Southeastern** 19:*15*
**speak** 51:*1*
**Speaking** 21:*11*
**spec** 10:*1*
**split** 25:*20*
**spoke** 41:*10* 47:*11*
**spoken** 34:*23*
**spring** 5:*14* 29:*10* 37:*4* 45:*16* 56:*19* 61:*17*
**springtime** 36:*13*
**spruce-up** 20:*9*
**square** 19:*3*
**squatter** 44:*10* 46:*16* 54:*11*
**SS** 64:*1*
**stage** 12:*5, 6*
**stager** 12:*3, 21*
**staging** 13:*2*
**stakes** 28:*11*
**stand** 62:*1*
**standing** 15:*9* 56:*23*
**stand-up** 15:*10*
**start** 4:*20* 14:*12* 37:*3* 59:*14*
**started** 7:*12, 16* 8:*7, 9, 12, 25* 9:*16, 25* 10:*3* 12:*12* 27:*14* 32:*21* 57:*4*
**State** 1:*1* 3:*7* 8:*20* 28:*24* 57:*20* 64:*1, 7, 22*

**stated** 58:*13*
**statement** 36:*8* 62:*2* 63:*11, 13*
**STATES** 1:*1* 23:*21* 33:*22* 34:*7* 45:*24* 54:*24* 62:*13*
**stating** 59:*18*
**status** 33:*20*
**STAWSKI** 1:*1* 64:*5*
**stood** 18:*3*
**storms** 36:*17*
**story** 62:*17*
**Street** 2:*1* 12:*7* 57:*20*
**strictly** 10:*10*
**structure** 19:*9*
**studs** 19:*8*
**stupid** 60:*2*
**subcontractors** 48:*3*
**subject** 15:*2*
**sucks** 61:*19*
**suggest** 46:*25*
**suit** 57:*7*
**Suite** 2:*1*
**summarizing** 28:*23*
**summer** 29:*20*
**sump** 34:*9* 35:*17* 36:*19*
**Super** 38:*20*
**supplement** 22:*12*
**support** 42:*7* 48:*4, 12, 21* 54:*1* 56:*16* 63:*10*
**supports** 49:*9*
**supposed** 35:*21* 39:*17* 56:*10* 60:*24*
**supposedly** 20:*18*
**sure** 14:*5* 22:*16* 24:*21* 26:*14* 27:*11* 32:*13* 36:*18* 37:*8, 19* 40:*2* 53:*20* 55:*16*
**surprised** 10:*19*
**sworn** 3:*3*

**< T >**
**take** 9:*24* 22:*15* 38:*12* 39:*18* 45:*18* 55:*20* 62:*9*
**taken** 1:*1* 9:*24*
*22*

**talk** 3:*14* 14:*24* 26:*4* 28:*13* 44:*24*
**talked** 27:*21* 45:*7*
**talking** 3:*23* 21:*11* 25:*20* 45:*11* 54:*7*
**tax** 10:*12*
**teacher** 6:*9*
**technical** 38:*3*
**tell** 4:*6* 6:*2* 11:*22* 25:*1* 48:*19* 49:*3* 51:*16, 18, 25*
**telling** 60:*15*
**ten** 6:*23* 22:*23*
**tenant** 13:*13*
**terms** 42:*19*
**testified** 3:*4* 26:*15* 62:*7*
**testifying** 25:*21*
**testimony** 25:*25* 26:*7* 27:*14*
**Text** 2:*1* 56:*1, 11, 24* 58:*10, 12* 59:*9, 15* 62:*6, 11*
**texts** 56:*16* 58:*2*
**Thank** 3:*22* 54:*22*
**thaw** 36:*14*
**theology** 6:*5*
**thing** 3:*18* 9:*6*
**things** 7:*25* 9:*17, 18* 14:*21* 51:*23* 52:*15* 53:*10* 54:*25* 56:*23*
**think** 10:*8, 10, 13* 12:*22* 14:*25* 17:*1* 21:*8, 24* 27:*4* 30:*9* 35:*5* 40:*4* 41:*17* 43:*21* 47:*12* 49:*12* 55:*6* 58:*4, 5* 59:*15* 60:*22* 61:*1*
**thought** 18:*16* 19:*14* 28:*16* 29:*9* 40:*7* 60:*10*
**three** 5:*22, 24*
**Thursday** 62:*15*
**tile** 35:*16* 36:*21*
**time** 4:*14* 9:*12* 13:*1, 2* 29:*18* 32:*2* 35:*21* 36:*1* 39:*24* 45:*1, 18, 23* 47:*10, 15* 57:*1* 59:*17* 60:*14* 61:*20*

**times** 5:*25*
**tiny** 60:*21*
**tired** 8:*6*
**told** 42:*9* 49:*14*
**tomorrow** 62:*13*
**top** 7:*19* 10:*13* 22:*7*
**topic** 61:*2*
**total** 10:*4* 16:*2* 63:*9*
**totally** 61:*2*
**Town** 13:*24, 25* 14:*5* 17:*7* 23:*23* 24:*1* 40:*13* 41:*19* 57:*12* 63:*4, 15*
**track** 58:*3*
**TRANSCRIPT** 3:*1*
**transitioned** 6:*10* 7:*21* 8:*5*
**Tree** 14:*17, 24* 15:*1, 4* 16:*14* 17:*15* 18:*21* 19:*24* 23:*11, 14* 24:*2* 25:*3, 23* 28:*9* 33:*16, 18* 34:*5, 15, 21* 41:*3, 16, 20* 44:*3* 46:*7, 14, 24* 47:*9* 48:*5* 51:*13* 55:*12, 20* 60:*23* 61:*5* 62:*20* 63:*16*
**trip** 29:*20*
**true** 45:*12*
**trusted** 14:*10* 20:*5*
**truth** 42:*10*
**try** 11:*7* 22:*6* 47:*6*
**Trying** 9:*18* 32:*24*
**turn** 20:*16* 48:*5*
**turns** 60:*8*
**Twenty-seven** 45:*24*
**two** 8:*14, 17* 11:*10* 12:*18* 14:*14* 19:*15* 47:*23* 52:*17* 55:*1* 57:*13*
**two-year** 12:*19*

**< U >**
**Uh-huh** 46:*22* 52:*20*
**ultimate** 9:*9, 14*
**Ultimately** 12:*14* 15:*24* 57:*5*
**undergrad** 7:*5*
**undergraduate** 6:*4*
**understand** 4:*6, 7, 21* 14:*25* 21:*7* 23:*7*

26:*12*  27:*6*  35:*23*
38:*11*  45:*11*  46:*10*
61:*17*  63:*12*

**understanding**  16:*23*
18:*13*  19:2, *12*  28:*10*
40:*16*, *24*  41:*4*  42:*1*
43:*11*  45:*19*  57:*12*

**Understood**  3:*21*  4:*3*,
*8*, *19*  15:*6*  27:*1*
41:*12*  61:*24*, *25*

**UNITED**  1:*1*

**units**  10:*8*

**University**  6:*5*, *8*, *24*
7:*1*

**unsigned**  37:*18*

**updates**  52:*15*

**upfront**  45:*17*  62:*8*

**upkeep**  20:*6*

**upset**  11:*14*

**use**  12:2  14:*9*  39:*20*

**utilize**  42:*10*


**< V >**

**vague**  62:*21*

**value**  25:*8*, *12*, *18*, *19*

**variations**  10:*21*

**verbal**  3:*19*

**verbally**  18:*5*  29:*2*

**Verification**  2:*1*
37:*18*, *21*, *24*, *25*  38:8
39:*8*, *20*  40:*3*, *15*

**Veronica**  11:*12*

**video**  35:*9*

**videoconference**  1:*1*

**view**  43:*4*

**viewed**  19:*17*

**viewing**  39:*14*

**volunteered**  12:*11*

**vs**  1:*1*


**< W >**

**wait**  9:*12*  40:*23*

**waited**  50:*18*, *20*

**walk**  18:22

**walked**  29:22

**want**  21:*20*  23:*6*
24:*21*  26:*14*  30:*11*,
*12*  32:7  37:*8*, *19*
39:7  40:*1*  48:7
61:*10*, *12*

**wanted**  13:*9*  17:*23*
20:*14*  28:*14*  38:*8*
50:*16*  52:*15*

**wants**  30:*13*

**water**  34:*16*  36:*15*,
20  62:*14*

**way**  4:*5*  7:*14*  11:*4*
15:22  29:*24*  35:*17*
40:*16*  49:*24*  52:9
53:2  58:*14*

**weather**  36:*5*

**week**  21:22  62:*17*

**weekend**  11:*4*

**weeks**  30:*3*

**Welcome**  38:*5*

**Well**  3:*13*  7:*1*, *3*, *12*,
*17*  8:22  14:22  15:*17*
21:25  22:9  23:5
24:*14*  25:*10*  31:7
35:25  38:*12*  44:*24*
46:*10*  48:*11*  52:*17*
54:*7*, *10*  56:*14*  57:*17*
59:25  60:5

**went**  6:*18*, *24*, *25*  7:3
16:12  26:*3*  28:7
32:25  43:*14*

**we're**  3:*23*  11:*19*
15:*3*  25:*20*  53:*6*, *21*
59:*6*

**we've**  43:*18*  59:*10*

**whereof**  64:*16*

**Whitefish**  19:*14*, *21*,
*22*

**Whitehouse**  33:*24*

**wife**  11:*10*  28:*18*
50:*16*

**wife's**  11:*11*

**window**  45:*14*

**windows**  7:*19*

**winter**  37:*3*

**WISCONSIN**  1:*1*
2:*1*  5:*9*, *11*  6:*19*, *22*,
*23*  8:*18*, *20*  11:25
19:*16*  27:*15*  29:*20*
35:*14*  36:*24*  37:2
61:*17*  64:*1*, *7*, *18*, *22*

**witness**  3:*3*, *16*  26:*2*,
*11*  27:9  32:22  43:*2*,
*4*  64:*16*

**wondering**  34:*19*

**work**  6:*10*, *12*, *25*
8:2, *7*  10:2  11:*1*
32:8  40:*1*  48:5

**worked**  6:*13*  7:*14*
9:21  14:*18*  19:*13*
32:*15*

**working**  7:*17*  8:6
11:*1*, *4*

**works**  11:*6*  32:*19*

**worst**  61:*19*

**worth**  18:*10*  19:*1*

**wrap**  12:*11*

**write**  31:*1*

**writing**  64:*10*

**wrong**  59:25

**Wycklendt**  57:*18*


**< Y >**

**yard**  20:7  51:*18*, *24*
58:*15*

**yeah**  6:*24*  7:*12*  9:*2*,
*20*  11:24  13:*21*, *25*
15:*6*, *9*  16:*23*  19:*19*
21:*13*  22:*14*  24:*3*
28:*10*  30:*17*  40:*10*,
*11*, *24*  41:*4*  43:*16*
44:*12*  47:*11*, *20*
50:*20*  51:22  53:*13*
54:*4*  56:*4*  58:*23*
60:7  61:*2*, *14*  62:*10*

**year**  12:*19*  33:*19*
36:*24*  52:*23*  61:*20*

**year-and-a-half**  12:*19*

**years**  5:22, *24*  6:*9*,
*12*, 22, *23*  7:*13*, 22
13:*1*  15:*15*  16:*10*
18:*24*  47:*24*

**Yep**  11:*10*  16:*15*
27:*19*  31:*11*


**< Z >**

**Zoom**  1:*1*  3:*23*  38:*3*
51:*20*

**Cream City Reporting LLC**
**414.585.8128**