## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

    Christopher E Knight,

    Debtor.

Case No. 24-22327-rmb

Chapter 7

Markos Ramirez

    Plaintiff,

v.

Christopher E Knight

    Defendant.

Adversary No. 24-02105-rmb

## POST-TRIAL DECISION

Debtor Christopher Knight borrowed money from Markos Ramirez to finance a "flip," i.e., the purchase, renovation, and sale of residential property. Knight did not tell Ramirez that he did not intend to sell the property after the renovation and instead intended to occupy the property himself and pay Knight not with sale proceeds but through a refinance of the debt. The renovations were never completed, and the property was never sold or refinanced. Ramirez seeks to have the debt owed to him declared non-dischargeable under 11 U.S.C. § 523(a)(2)(A). Having reviewed the evidence presented at trial, the Court concludes that Ramirez did not carry his burden of proof and he is not entitled to a declaration of nondischargeability.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and the order of reference from the district court pursuant to 28 U.S.C. § 157(a). *See* 84-1 Order of Reference (E.D. Wis. July 10, 1984) (available at https://www.wieb.uscourts.gov/general-orders) (last visited Sept. 22, 2025). Determination of the dischargeability of a debt is a core

proceeding under 28 U.S.C. § 157(b)(2)(I).  To the extent the determination of dischargeability requires consideration of issues impacted by the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), the parties have consented to the bankruptcy court's final adjudication of these issues by their silence.  *See* Fed. R. Bankr. P. 7008, 7012; *see also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683 (2015) ("Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express.").  This decision constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND

The only two witnesses at trial were creditor Markos Ramirez and debtor Christopher Knight.  The Court also admitted 31 exhibits into evidence.  The Court finds the following facts based on the testimony and exhibits.

During the time relevant to this adversary proceeding, both Ramirez and Knight were involved in the "house-flipping" industry.  House flipping generally involves the purchase, quick renovation, and re-sale of residential property for profit.  Ramirez has worked on house renovations since 2010, and Knight started working in the industry approximately ten years ago.

Ramirez met Knight in or around 2018 when Knight worked as a stager[1] on a property that Ramirez had invested in.  Between 2018 and 2020, Ramirez and Knight worked together on several projects, although neither testified at trial regarding the number of projects they worked on, the extent or nature of their respective involvement in the projects, or whether Ramirez had loaned money to Knight for any of the prior projects.

---

[1] Staging involves arranging furniture in a house to make it more appealing to potential buyers.

In February 2021, Knight approached Ramirez about a prospective flip property. In a telephone conversation, Knight requested that Ramirez extend a loan for the purchase of a distressed property at 1005 Lone Tree Road, Elm Grove, Wisconsin 53122 (the "Property"). During the conversation, Knight mentioned that he anticipated making several hundred thousand dollars in profit from flipping the Property.

On February 5, 2021, Knight sent Ramirez an email regarding the proposal:

> Hello!
>
> Take a look, let me know if you have questions. Very straight forward. EM of $5000 due Monday which obviously is include in down payment below.
>
> > Purchase Price: $370,000
> > Improvements: $100,000
> > ARV: $850-$900k
> > Hard Money Loan: $470,000 (Ben)
> > Down Payment: $47,000 (Markos)
> > Loan Payments: $72,000 (Markos)
> > Markos Total: $119,000
> > Markos Fee: $75,000
> > Markos Total: $194,000
>
> Thank you!
>
> Chris

Dkt. No. 19, Ex. 3.

Under the February proposal, Ramirez would invest $119,000: $47,000 would be used for a down payment at the time of purchase (with $5,000 used for an earnest money deposit), and $72,000 would be used to make loan payments to the primary lender, Ben Sadek, who would finance the remainder of the purchase price and the renovations through his company, Home Rehab Lending, LLC ("HRL"). In return, Ramirez would receive a total of $194,000 when the Property was sold, netting him a profit of $75,000.

The term "ARV" in Knight's email refers to the "after repair value." Both parties testified that ARV refers to the estimated sale price of a flipped property after renovations. The expected ARV is key information for an investor. According to Ramirez, his decision whether to invest in a particular property is driven by the ARV. He likes to see a big difference between the total investment – i.e., the purchase price plus the renovation and carrying costs – and the ARV. The greater the difference between the expected total investment and the expected ARV, the less risky the investment is for him. A large cushion allows for unexpected repair costs and potential swings in the market, while still protecting his initial investment and expected profit.

On February 7, 2021, Knight sent Ramirez another email detailing some of the Property's specifications and stating: "And all in for $600k including your profit. This is a cannot lose. First money in first money out." Dkt. No. 19, Ex. 4. Ramirez understood that Knight's characterization of the deal as "cannot lose" referred to the margin between the investment of approximately $600,000 and the ARV of approximately $850,000-900,000. This margin meant that there was a cushion of $250,000 to $300,000 between the expected investment (including Ramirez's $75,000 profit) and the final value. Ramirez agreed to make the loan and provided $5,000 in earnest money. Ramirez believed Knight would renovate the Property and re-sell it quickly for a profit.

Knight purchased the Property through his company, East Town Management LLC ("East Town"), on October 13, 2021.[2] The terms of the loan from Ramirez changed by the time the transaction was finalized. Ramirez loaned a total of $75,000 to Knight and East Town. Dkt. No. 19, Ex. 1. In addition to the $5,000 earnest money deposit, Ramirez provided $36,000 for the down payment at the time of the purchase. *Id.* Ramirez then disbursed $6,000 each month

---

[2] The reason for the delay between the February offer to purchase and the October closing date is not entirely clear. Knight testified that there may have been legal disputes among the heirs of the deceased owner of the property.

between November 2021 and March 2022, and $4,000 in April 2022. *Id.* The monthly disbursements were used to pay the monthly interest that accrued on the larger loan from HRL. The loan was set to mature in six months, on April 13, 2022, at which time the entire principal of $75,000 would be due, and Ramirez would also receive an additional "return on principal" of $75,000. *Id.* The loan was secured by a second mortgage on the Property; the first mortgage was held by HRL.

The parties agree that they expected the Property likely would not be renovated by mid-April 2022. Ramirez expected that the renovations would be completed in six to nine months so the Property could be listed for sale in late spring or summer of 2022. According to Knight, the parties discussed that the renovation would take at least twelve months.

Knight did not disclose that his intent from the beginning was to renovate the Property, personally purchase the Property from East Town, and obtain a new personal loan to pay off the loans from Ramirez and HRL. Before purchasing the Property, Knight had successfully flipped 15 to 20 houses, and he purchased four of those properties after renovation to use as his principal residence. Similar to this case, Knight borrowed money from Sadek or HRL[3] for those flips, and he did not disclose beforehand that he intended to buy the properties after they were renovated. Because of his past success in renovating and refinancing homes for his personal residence, Knight did not believe it was important to notify a lender that he was going to live in the Property instead of selling it.

Knight's intent to live in the Property made the loan riskier for Ramirez. According to Ramirez, it is the general practice in the house flipping industry that the flipper does not reside in

---

[3] Knight testified that the investor in his first property was not Sadek or HRL, but that after the first property "I never had a real estate transaction that I didn't do with Mr. Sadek." Based on this testimony, the Court has assumed that Sadek and/or HRL provided a loan or investment for each of the four properties that Knight later occupied.

the property after a renovation, in part because it decreases the pool of buyers and the potential purchase price. If a property will be listed for sale, then the pool of potential buyers is wide. Indeed, Ramirez was attracted to invest in the Property because of the desirability of its location and the expected number of buyers willing to pay top dollar for a renovated house in that area. If a property will be renovated for the benefit of the flipper, then there is just one potential buyer. The ultimate sale transaction then depends on what that one person is willing to pay and whether that person can obtain a loan to refinance the existing debt. Ramirez said he viewed such a situation as more of a personal loan and not an investment in a property to be flipped. The loan he made for the Property was not intended to be a personal loan to Knight. When he made the loan, Ramirez believed it would be a typical house flip investment; Knight even referred to his potential to make several hundred thousand dollars in profit, leading Ramirez to believe the Property would be a traditional flip.

After the purchase, Ramirez and Knight communicated frequently regarding the status of the renovation, with Ramirez frequently pushing Knight to move the renovation along more quickly. On December 22, 2021, Ramirez requested an update on the renovation, "[a]s well as an expectation for listing." Dkt. No. 19, Ex. 6 at 2. That is, Ramirez wanted to know when the Property would be listed for sale. Knight responded, "We said 12 mos or less on lone tree so we are far off on that one." *Id.* He did not disclose that he had no intent of listing the Property for sale.

In late April 2022, Knight started to investigate refinance options. Dkt. No. 21, Exs. 106, 109. Sometime between April and June 2022, after the maturity date of the loan from Ramirez, Knight disclosed to Ramirez that he would not be selling the Property and would instead seek a personal loan to refinance the Property. *See* Dkt. No. 19, Ex. 6 at 4 (requesting "date for re-fi").

6

By that time, Ramirez had already given the loan to Knight, and he was eager to be repaid as quickly as possible.

By July 2022, there was still significant work to do on the Property to complete the renovations, so Knight started the process of moving into the Property with his family. He sold his other house, and his family moved into the Property in mid-September 2022. *See* Dkt. No. 19, Ex. 6 at 9. Knight said he made the move so that he could spend more time with his family while working on the renovations. All the while, Ramirez kept asking for updates and pressured Knight to move forward more quickly so Knight could obtain a refinance loan and repay Ramirez.

By the end of November 2022, the parties' relationship had significantly deteriorated. Ramirez pushed for updates regarding progress on the renovation and refinance, and Knight repeatedly asked for more time. In November 2022, after a call during which Knight said he could not list the house due to the condition of the yard, Ramirez wrote, "Our deal was to flip a house. Plan was to list in August. I had no problem with you keeping the house, I'm happy for your family to be in the home. But you aren't able to get the mortgage it seems. How do we move forward? I need this resolved." Dkt. No. 19, Ex. 6 at 17.

On January 12, 2023, Ramirez sued Knight and East Town to foreclose his mortgage. On June 6, 2023, the state court entered a foreclosure judgment, and on June 12, 2023, the court entered a money judgment against Knight and East Town in the amount of $160,855.25. Dkt. No. 19, Ex. 8. East Town filed a chapter 11 bankruptcy petition on February 26, 2024. *In re East Town Management, LLC*, Case No. 24-20856 (Bankr. E.D. Wis.). Pursuant to East Town's confirmed chapter 11 plan, Ramirez's second mortgage was stripped from the Property and classified as a general unsecured claim. Such claims are not expected to receive any payment

from East Town. Knight filed his own chapter 7 petition on May 3, 2024 and received a discharge on October 7, 2024. Ramirez filed this adversary proceeding asking that the Court declare the debt owed to him to be excepted from the discharge under 11 U.S.C. § 523(a)(2)(A).

## DISCUSSION

Ramirez objects to the discharge of the debt owed to him under 11 U.S.C. § 523(a)(2)(A), which excepts from discharge debts "obtained by . . . false pretenses, a false representation, or actual fraud . . . ." 11 U.S.C. § 523(a)(2)(A). To have a debt declared nondischargeable under § 523(a)(2)(A), the creditor must show: (1) that the debtor made a false representation or omission, that he either knew was false or made with reckless disregard for the truth, (2) that the debtor had an intent to deceive or defraud, and (3) that the creditor justifiably relied on the representation or omission. *Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011). The creditor must prove each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). "[E]xceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor." *Goldberg Securities, Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992).

Ramirez presented sufficient evidence at trial to establish the first and third elements under § 523(a)(2)(A), but he did not present sufficient evidence to establish the second element of intent. The Court addresses each element below.

### 1. Knight Knowingly Created a False Impression by Omitting Information.

Debts within the scope of § 523(a)(2)(A) often involve overt misrepresentations, but that section "encompasses a broader category of debts than misrepresentation, including those involving 'any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.'" *Landmark Credit Union v. Reichartz* (*In re Reichartz*), 529 B.R. 696, 699 (Bankr. E.D. Wis. 2015) (quoting *McClellan v. Cantrell*, 217 F.3d 890, 893

8

(7th Cir. 2000)).  Thus, an overt misrepresentation is not required for a debt to be excepted from

discharge.  *Harry Kaufmann Motorcars, Inc. v Benton (In re Benton)*, 540 B.R. 372, 377 (Bankr.

E.D. Wis. 2015).  "Instead, omissions or a failure to disclose on the part of the debtor can

constitute misrepresentations where the circumstances are such that omissions or failure to

disclose create a false impression which is known by the debtor."  *Memorial Hosp. v. Sarama (In

re Sarama)*, 192 B.R. 922, 928 (Bankr. N.D. Ill. 1996); *see also Benton*, 540 B.R. at 377 ("Thus,

silence or concealment may constitute false pretenses."); *Baermann v. Ryan (In re Ryan)*, 408

B.R. 143, 157 (Bankr N.D. Ill. 2009) ("A debtor's failure to disclose pertinent information may

be a false representation where the circumstances imply a specific set of facts and disclosure is

necessary to correct what would otherwise be a false impression.").  Such circumstances exist

"when a debtor, with the intent to mislead a creditor, engages in 'a series of events, activities or

communications which, when considered collectively, create a false and misleading set of

circumstances, or understanding of a transaction, in which the creditor is wrongfully induced by

the debtor to transfer property or extend credit to the debtor.'"  *Illinois Dep't of Emp. Sec, (In re

Davis)*, 668 B.R. 580, 599 (Bankr. N.D. Ill. 2025) (quoting *Sterna v. Paneras (In re Paneras)*,

195 B.R. 395, 406 (Bankr. N.D. Ill. 1996)) (cleaned up).

For example, in *In re Paneras*, the debtor and his wife were married in 1991.  195 B.R. at

399.  However, the debtor's divorce from his former spouse was not finalized until 1993, a fact

known to the debtor but not his wife.  *Id.*  In 1992, before the wife learned the prior marriage was

not finalized, she agreed to co-sign with the debtor on two loans that she alleged were for his

benefit.  *Id.*  The parties separated in 1993 and were divorced in 1994.  *Id.*  Rather than pay the

loans that his then-wife co-signed, the debtor filed bankruptcy in 1995.  *Id.* at 400.  The wife

alleged that she would not have co-signed the loans if she had known that the debtor was not

legally divorced from his prior spouse at the time of the loans. *Id.* The bankruptcy court held

that the debtor "created a false and misleading set of circumstances" by failing to inform his wife

that his divorce from his former spouse was not finalized. *Id.* at 407.

Here, Ramirez argues that Knight should have told him that Knight intended to purchase

the Property himself after the renovations were complete and that he never intended to sell the

Property to a third party. Ramirez says that this created a false impression that Knight was

planning to do a traditional "flip" of the Property to make a cash profit. For his part, Knight

agrees that he never wanted to sell the Property after the renovation, that he did not intend to put

the Property on the market after the renovation, and that he did not disclose any of this to

Ramirez. He argues, however, that § 523(a)(2)(A) does not apply because he never actually told

Ramirez that he would sell the Property after the renovations were complete.

Contrary to his assertion, Knight need not have affirmatively and falsely told Ramirez

that he would sell the Property to a third party. Knight's failure to disclose his true intent

regarding the Property is enough because it changed the nature of the loan transaction and

created a false and misleading set of circumstances. Ramirez expected that the Property would

be sold after the renovations; he did not expect that Knight would keep it. Rather than financing

Knight's short-term endeavor to renovate and re-sell the Property at a profit, Ramirez was

essentially financing Knight's renovation of his own house. It was a different deal entirely.

Knight knew that he was giving Ramirez a false impression. In their first conversation

about the Property, Knight told Ramirez that he (Knight) stood to profit several hundred

thousand dollars, which suggested that Knight would walk away from the sale with a cash profit,

not with equity in his new house. In addition, Knight was well aware that referring to the

Property as a "flip" would lead Ramirez to believe that the Property would be sold after the

renovations. Modern reality television lineups are flush with shows that depict "flippers" who purchase residential real estate, renovate it, and then *sell* it for a profit. The term "flip" with respect to real estate is now so ingrained in the modern lexicon that there is an entry in the dictionary for this meaning of the word "flip." *See Flip*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/flip (last visited Sept. 22, 2025) ("flip" means "to buy and usually renovate (real estate) so as to quickly *resell* at a higher price") (emphasis added). Knight also failed to correct Ramirez when Ramirez several times pressed him about the expected sale date. All this demonstrates that Knight new Ramirez thought he was planning to sell the Property after renovation even though he was planning to keep it.

## 2. Ramirez Justifiably Relied on the Omission.

Ramirez also established that he justifiably relied on the misleading nature of Knight's failure to disclose that he did not intend to sell the Property. "Justifiable reliance is a less demanding standard than reasonable reliance; it requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010) (quoting *Field v. Mans*, 516 U.S. 59, 71 (1995)). A plaintiff is justified in relying upon representations whose falsity, although ascertainable from some investigation, are nevertheless not ascertainable to one of like knowledge and intelligence from a cursory glance. 516 U.S. at 71.

Under the justifiable reliance standard, a creditor has no duty to investigate unless the falsity of the representation would have been readily apparent. *Ojeda*, 599 F.3d at 717; *see also Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 676 (7th Cir. 1995) ("A victim who lacks access to the truth, and has not been alerted to facts that would alert him to the truth, is not to be . . . blocked by a discharge under the bankruptcy laws . . . just because he did not conduct a more thorough

11

investigation."). "[T]he justifiable reliance standard is not an objective one. Rather, it is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff." *Ojeda*, 599 F.3d at 717.

At least one court has concluded that a creditor like Ramirez justifiably relied on a debtor's representations as to whether he would live in a flip property after renovation. In *Portman v. Zipperer (In re Zipperer)*, 447 B.R. 908 (Bankr. S.D. Ga. 2011), the creditor agreed to lend the debtor the down payment for a property with the understanding that the debtor would purchase the property, perform renovations, and list and sell the property, hopefully within six months. *Id.* at 910. The creditor later lent additional funds to complete the renovations. *Id.* at 911. The debtor moved into the property and never repaid the loan. *Id.* at 913. The bankruptcy court found that the debtor never intended the property to be an investment, and that he always intended it to be a second or vacation home. *Id.* at 914. The court also determined that the creditor justifiably relied on the debtor's representation that the property would be flipped and had made the loan with the understanding that the property would be sold after renovation. *Id.* at 914-15.

Here, like the creditor in *Zipperer*, Ramirez justifiably relied on Knight's representation that Knight's purchase of the property would be a traditional "flip." Ramirez credibly testified that he would not have made the loan to Knight if he had known that Knight did not intend to sell the Property and instead intended to renovate the Property for himself. According to Ramirez, this made a difference because the pool of potential buyers dwindled from "the world" to just Knight. When Ramirez evaluated the transaction before making the loan, he understood that Knight wanted to make several hundred thousand dollars in profit. For Knight to do that, he would need to renovate the Property quickly and in a manner that would appeal to a wide variety

of buyers. Knight's true intent to occupy the Property would have changed Ramirez's risk calculus because it would change Knight's view of the deal. If the renovation was for Knight alone, Knight might expect to gain equity in the Property, but he might perform the renovations more slowly or in a different manner because he was not motivated to make a quick cash profit.

It is certainly possible that a sale to a third party may not have netted sufficient funds to pay Ramirez in full, but Ramirez credibly testified that a deal where Knight was the buyer was a riskier proposition than a deal where the Property would be sold to a third party. Knight did not rebut Ramirez's testimony regarding Ramirez's risk calculus or the testimony that Ramirez would have viewed the loan as a much riskier deal and would not have made the investment if Knight had disclosed his intent to refinance the Property for himself.

Knight's only response to Ramirez's testimony focused on Ramirez's actions and statements in 2022, long after Ramirez made the loan. Knight argues that his intent to occupy and refinance the Property could not have been material to Ramirez at the outset of the loan, because by mid-2022 Ramirez was willing to be repaid through Knight's refinance of the debt. But Ramirez credibly explained why he agreed that Knight could refinance the debt and keep the Property for himself. By the time Knight disclosed his intent to Ramirez, around the time of the maturity date of the loan in April 2022, Ramirez just wanted to be repaid; he did not care where the funds came from. Just because Ramirez agreed in 2022 with Knight's plan to purchase the Property himself does not mean Ramirez would have made the loan in 2021 had he known the true nature of the loan.

### 3. Ramirez Did Not Prove Knight Intended to Deceive Him.

Ramirez's claim falls short at the intent element. A debtor's knowledge of a false representation or false pretense is not enough under § 523(a)(2)(A); the debtor also must intend to *deceive*, meaning that he must intend to induce the creditor to rely on the false representation

13

or omission to his detriment. *See Ojeda*, 599 F.3d at 717 (debtor must make a false representation or omission "that the debtor (a) knew was false or made with reckless disregard for the truth *and* (b) was made with the intent to deceive") (emphasis added). Deception is proven by demonstrating that a debtor intentionally induced the creditor to act based on the false representation. *See Whitcomb v. Smith*, 572 B.R. 1, 15 (B.A.P. 1st Cir. 2017) (creditor must prove, among other elements, that "the debtor intended to induce the creditor to rely upon the false statement"); *Holton v. Zaidel (In re Zaidel)*, 553 B.R. 655, 663 (Bankr. E.D. Wis. 2016) (citing *Sarama*, 192 B.R. at 927) ("An intent to deceive may be inferred from a false representation which the debtor knows or should know will induce another to advance money to the debtor.").

Intent to deceive is measured by the debtor's subjective intention at the time the representation was made. *CFC Wireforms, Inc. v. Monroe* (*In re Monroe*), 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004). Because direct proof of fraudulent intent is often unavailable, fraudulent intent "may be determined from the totality of the circumstances of a case and may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *Cent. Credit Union of Ill. v. Logan* (*In re Logan*), 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005). "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 315 (Bankr. N.D. Ill. 2001).

As noted above, Knight knew he was creating a false impression regarding his purchase of the Property by failing to disclose that he did not intend to sell it after renovation. There is not sufficient evidence, however, that Knight intended that his failure to disclose this information would induce Knight to lend. Knight credibly testified that he did not think it would make a

difference to Ramirez whether the Property was sold to a third party or whether he kept the Property. Knight had purchased four of his prior flips, and the lender never complained. Indeed, the lender (presumably HRL or Sadek) continued to lend to Knight. This led Knight to believe that lenders like HRL, Sadek, and Ramirez cared only about the expected ARV and the speed of the flip and did not care who would purchase the renovated property as long as the project otherwise proceeded as a traditional flip.

This case is unlike *Zipperer*, where the debtor never intended to treat the property at issue as a traditional flip. Here, Knight intended at the outset to treat the Property as a traditional flip, except that he would be the buyer. There is not enough evidence that Knight knew Ramirez would lend only if he thought the Property would be sold to a third party.

Ramirez argues that Knight's actions after the loan are evidence of his intent to deceive Ramirez. He says that Knight was slow to renovate the Property and that he used the loan from Ramirez to "fund his personal lifestyle." There was no evidence at trial to support either assertion.

With respect to the speed of the renovation, there is no question that the renovation took far longer than the parties expected; Knight testified that the renovations still were not complete by the time of trial. Ramirez says that this shows Knight he did not intend to treat the Property as a traditional flip as he had led Ramirez to believe he would. But there was no evidence at trial regarding the reason for the plodding pace. Ramirez attributed some of the issues to "poor planning on the contractor's part," but Knight's failure to appropriately plan out the renovations does not show that he intended to deceive Ramirez when Ramirez agreed to make the loan. There is no other evidence that Knight dragged out the renovation on the Property because he intended for it to be his home rather than a traditional flip. One might infer that Knight turned

15

his attention to other business and treated his "personal" project as a lower priority, but the Court must base such an inference on evidence, and there is no evidence to support that inference. To the contrary, Knight's credible testimony suggested that he intended at the outset to treat the Property in the same way he would treat a traditional flip with respect to the timing of the renovations and the return to his investors.

Ramirez's assertion that Knight used the loan proceeds to fund his personal lifestyle is confusing at best. The parties agree that Knight used the loan proceeds from Ramirez for the escrow deposit, the down payment, and then the monthly interest payments due HRL between November 2021 and April 2022. That is, Knight used the loan proceeds from Ramirez exactly as the parties contemplated he would. Ramirez argues that his money freed up funds that Knight would otherwise have used for interest payments or other expenses related to the Property and that Knight used those freed up funds for his lifestyle. Again, one might guess that the project took so long because Knight was not devoting money and other resources to the renovation as he should have during the period that Ramirez was funding the interest payments to HRL. But, again, there must be evidence to support that inference. There is no evidence at all that Knight did not spend money on the renovation when he should have or that he spent money intended for the renovation on personal expenses.

In sum, there simply is not enough evidence that Knight intended to deceive Ramirez into believing the Property would be treated as a traditional flip when it would not. Without such evidence, the Court cannot conclude that Ramirez satisfied his burden of proof with respect to the intent element.

## CONCLUSION

Ramirez presented sufficient proof that Knight acted with false pretenses and that Ramirez justifiably relied on Knight's omission of key details regarding the loan transaction.

Ramirez did not, however, present sufficient evidence that Knight intended to deceive Ramirez, which is a requirement for a debt to be declared nondischargeable under § 523(a)(2)(A). Therefore, the Court will deny Ramirez's request for a declaration of nondischargeability. The Court will enter a separate order consistent with this decision.

Dated: September 23, 2025

Rachel M. Blise
U.S. Bankruptcy Judge